IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| **MID-STATES SUPPLY COMPANY, INC.,** | Case No. 16-_____ (___) |
| Debtor. | |

**MOTION TO PAY CERTAIN PRE-PETITION WAGES, SALARIES, COMMISSIONS, BENEFITS, PAYROLL TAXES, AND OTHER EMPLOYEE-RELATED EXPENSES ACCRUED AND PAYABLE IN THE ORDINARY COURSE OF DEBTOR'S BUSINESS**

Debtor Mid-States Supply Company, Inc., pursuant to 11 U.S.C. §§ 105(a) and 507, and in support of its Motion to Pay Certain Pre-Petition Wages, Salaries, Commissions, Benefits, Payroll Taxes, and Other Employee-Related Expenses Accrued and Payable in the Ordinary Course of Debtor's Business (the "Motion"), states and alleges as follows:

**Procedural Background**

1. On February 7, 2016 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri.

2. Debtor remains in possession of its assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3. An Official Committee of Unsecured Creditors has not yet been appointed.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A).

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

WA 7763414.1

**Debtor's Background**

7. Debtor supplies pipes, valves and fittings to ethanol, pipeline and power industries in the United States. It also offers hoses, tools, compounds, gauges and thermometers. In addition, Debtor provides compressed air, steam, process control and services, along with IT solutions, such as project and customer websites, PocketPC software, customer inventory management, integrated supply, order tracking system and communication options. Debtor's products are sold to a myriad of industries, including large industrial plant operations, food production, oil and gas pipeline transportation, mechanical construction and other large industrial players.

8. Founded and headquartered in Kansas City, Missouri since 1947, Debtor, a family-owned company, operates out of 23 locations, certain of which branches operate under the "Midco" fictitious brand name, in the following states—Alabama, Colorado, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, Utah, West Virginia and Wyoming. Debtor currently has approximately 228 employees.

9. On September 1, 2011, Debtor entered into Credit and Security Agreement, as amended from time to time (the "Credit Agreement") with Wells Fargo Bank, National Association ("Wells Fargo"), under which it borrowed $45 million, which line grew with its growth to approximately $60 million. Using the expanded availability from Wells Fargo, Debtor roughly doubled its sales and EBITDA from fiscal 2011 through today. By 2015, a confluence of factors, including the demand for inventory with over 32,000 SKU's, no concentration in the customer base (meaning a broad demand for stocked product) and a rapid decline in the oil and gas sector, kept Debtor's inventory and payables at unsustainably high levels. These factors led Debtor's management to implement plans to right-size the business with respect to inventory, payables, rationalizing the customer base, operating expenses and tightly managing cash flow.

10. As a result of various defaults under the Credit Agreement, on August 28, 2015, Debtor entered into its first forbearance agreement with Wells Fargo. In connection with this forbearance agreement and Debtor's restructuring efforts, on August 25, 2015, Debtor engaged Winter Harbor LLC to provide certain services of a chief restructuring officer ("CRO") and other support services. Stuart Noyes has been acting as Debtor's CRO since August 2015 pursuant to an engagement letter dated August 25, 2015, which is discussed in further detail in Debtor's application to employ Winter Harbor LLC.

11. Since the first forbearance agreement with Wells Fargo, Debtor has entered into two other forbearance agreements with Wells Fargo, the most recent of which, dated December 28, 2015, expires by its terms on February 29, 2016 and contains numerous benchmarks (the "Benchmarks"). While Debtor and its CRO have been working tirelessly to restructure its business and meet the Benchmarks, Debtor has determined in its business judgment that filing the captioned bankruptcy case is in the best interest of its creditors.

12. The payment of the Pre-Petition Wages, Reimbursements and Employee Benefits (as defined below) is necessary to the retention of Debtor's workforce and is, thus, essential to the continued viability of Debtor's reorganization. Without the relief requested herein, Debtor's ability to maintain its operations will be substantially impeded.

13. None of the Pre-Petition Wages and Reimbursable Expenses to be paid by Debtor to or on behalf of any individual Employee exceeds the $12,475 limit set forth in Code § 507(a)(4).

14. The budget (the "Budget") attached to Debtor's Emergency Motion to Approve Stipulation and Interim Order (I) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C.

363 and 364, (III) Granting Adequate Protection Pursuant to 11 U.S.C. 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C) (the "DIP Motion") takes into account payment of the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits.

### The Pre-Petition Wages and Reimbursable Expenses

*The Pre-Petition Wages*

15. As of the Petition Date, Debtor has approximately 228 employees (the "Employees"). Of the Employees, approximately 102 are salaried, 124 are hourly and two (2) are commission-based.

16. Debtor seeks authorization to honor all outstanding pre-Petition Date payroll obligations owed to the Employees (the "Pre-Petition Wages"). Approximately four percent (4%) of Debtor's payroll costs represents compensation paid to senior executives, with the remaining ninety-six (96%) representing compensation to middle management or rank and file Employees.

17. Debtor's payroll is processed through Paychex of New York LLC ("Paychex"). To ensure timely payment of the Pre-Petition Wages, net Pre-Petition Wages are funded by Debtor one day prior to the applicable payday through a transfer of funds from Debtor's operating account to a Paychex account from which Employee checks and direct deposits are made. Withholding taxes are transferred from Debtor's operating account to a Paychex account on the day the Pre-Petition Wages are paid.

18. Debtor's salaried Employees are paid on a semi-monthly basis current through the date of the applicable payday. Select salaried and hourly Employees also receive a monthly sales commission or performance based bonus. Prior to the Petition Date, Debtor's salaried payroll obligations averaged approximately $420,000 in the aggregate per pay period for regular

earnings. In addition, approximately $67,000 in sales commissions, $35,000 in performance bonuses and $27,000 in car allowances were paid monthly. Debtor's last regular payroll date was January 29, 2016, which paid Employees through January 31, 2016. The next payroll date is scheduled for February 12, 2016, and will include regular earnings, sales commissions, performance bonuses and car allowances.

19. Debtor has two groups of hourly Employees that are paid weekly or bi-weekly. Approximately 42 Employees are paid weekly each Friday for wages earned through Wednesday of the current week. The weekly employee payroll obligations average approximately $93,000. Approximately 82 Employees are paid bi-weekly every other Tuesday for wages earned through Friday of the previous week. The bi-weekly Employee payroll obligations average approximately $125,000. The last payroll paid for weekly employees was February 5, 2016 and for bi-weekly employees was February 2, 2016. The next payroll date for the weekly Employees is February 12, 2016, and the next payroll date for the bi-weekly Employees is February 16, 2016.

20. Debtor also has two Employees whose wages are 100% commission-based and are paid on or about the 15th of each month. Debtor estimates outstanding sales commissions due to those 100% commission Employees is approximately $23,000. For all remaining sales-commissioned Employees, Debtor estimates the outstanding amount due is approximately $90,000. The next payroll date for these commission-based Employees is February 12, 2016.

21. Debtor believes that as of the Petition Date, no more than $550,000 in payroll obligations have accrued but not yet been paid, with no one employee owed in excess of $12,475 on account of payroll checks in float.

*Reimbursable Expenses*

22.  Prior to the Petition Date and in the ordinary course of its business, Debtor reimbursed Employees for expenses incurred within their scope of employment related to, among other things, business-related travel expenses, business meals, car rental and a variety of other business-related expenses. Employees may submit expense reports twice a month, which are approved and paid on the 15th and the last day of each month.  In addition, Debtor, through Wells Fargo, will continue to provide a select number of Employees with corporate credit cards (the "Corporate Cards") to be used solely in connection with expenses incurred within the scope of their employment relating to, among other things, business-related travel expenses, business meals, car rentals and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses").  Employees use the Well Fargo online expense reporting system to review and assign expense categories to charged expenses which are then ratified by a designated approver. Wells Fargo settles the balance of charges daily through advance funding into Debtor's operating account.

23.  Debtor offers a car allowance to select salaried Employees intended to cover certain operational expenses for vehicle use incurred within the scope of their employment. These car allowances amount to $525 per Employee.  There were 35 Employees eligible to receive a car allowance in January 2016, which allowance was in the aggregate approximate amount of $18,375 and was paid with the payroll dated January 15, 2016.  Car allowances for select salaried Employees are paid the 15th of each month.

24.  Based upon historical averages, Employees incur Reimbursable Expenses aggregating on average approximately $50,000 per month.   All of the Reimbursable Expenses were incurred on Debtor's behalf in connection with employment by Debtor and in reliance by

the Employees that such Reimbursable Expenses would be paid directly by Debtor. Debtor estimates that outstanding Reimbursable Expenses as of the Petition Date are approximately $29,000. Debtor seeks the Court's authority to pay any such Reimbursable Expenses.

*Employee Benefits*

25. In the ordinary course of its business, and as is customary for most large companies, Debtor has established various employee benefit plans and policies that provide Employees with medical, dental, prescription, disability and life insurance and other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below.

    a. <u>Health Insurance</u>. An important element of the Employee Benefits is medical and similar health insurance. After a 60-day waiting period from hire date, all full time Employees, with the exception of St. Louis union employees who currently opt out, are eligible to participate. As of January 1, 2016, Debtor is partially self-insured up to a specific limit for medical coverage through Blue Cross and Blue Shield of Kansas City (the "Medical Plan"). The total cost of the Medical Plan consists of the monthly premiums and self-insured claims paid by Blue Cross and Blue Shield of Kansas City on behalf of Debtor.

    Debtor was required to make a deposit of approximately $180,000 to Blue Cross and Blue Shield of Kansas City as part of entering into the new Medical Plan effective January 1, 2016 consisting of a $20,000 binder for the fixed premiums and $160,000 for the self-insured claims. The monthly premiums for January 2016 and February 2016 totaled approximately $103,000, leaving a balance due of approximately $83,000. Self-insured claims paid by Blue Cross and Blue Shield of Kansas City for January 2016 were

approximately $74,000, leaving a credit balance of approximately of $86,000. Debtor seeks authority to pay all amounts due under the Medical Plan.

Prior to January 1, 2016, Debtor was partially self-insured up to a specific limit for medical coverage under a different medical plan (the "Prior Medical Plan"). Monthly, the third party administrator processes the claims and issues checks/electronic fund transfers on Debtor's health care bank account. Self- insured medical claims paid by Debtor have averaged $272,000 the past several months. As of the Petition Date, Debtor believes the total outstanding liability related to self-insured medical claims incurred prior to January 1, 2016 that have not yet been paid is approximately $350,000. Debtor seeks authority to pay all amounts due under the Prior Medical Plan.

      b.      <u>Dental and Vision Coverage</u>. Debtor offers fully-insured dental coverage through Humana Insurance Company (the "Dental and Vision Plan"). Prior to the Petition Date, the average monthly cost of the Dental and Vision Plan was approximately $13,000, all of which was borne by the Employees. As of the Petition Date, premiums for the Dental and Vision Plan for February 2016 premiums are outstanding. Debtor seeks authority to pay the February 2016 premiums for the Dental and Vision Plan.

      c.      <u>Miscellaneous Benefits</u>. Debtor provides all of its eligible full-time Employees with fully-funded life and accidental death and dismemberment insurance. Additionally, Debtor provides the Employees with short and long-term disability insurance. The premiums are shared equally between Debtor and Employee. Employees can also purchase additional disability and life insurance funded 100% by the Employee. Prior to the Petition Date, the average monthly premium costs (both Employee and Debtor portion), in the aggregate, for these additional benefits was approximately

$20,000. As of the Petition Date, there were no outstanding premiums related to these benefits.

      d.    <u>401(k) Contributions</u>. Debtor offers all eligible Employees an opportunity to participate in a 401(k) plan (the "401(k) Plan"). Participating Employees may contribute a percentage or fixed dollar amount of their compensation per payroll period, up to the annual statutory limit, to the 401(k) Plan. An Employee is eligible to participate in the 401(k) Plan if the Employee has completed one month of service. Debtor employs approximately 30 weekly- paid union Employees in Kansas City. The Kansas City Teamsters Local Union No. 541 agreement requires Debtor to contribute $1.00 for every hour worked to the 401(k) Plan for those union employees.

Employees can also take on loans from the balance of their 401(k) Plan and re-pay the loan through deductions from their paycheck.

Prior to the Petition Date, the average amount of Debtor contributions/loan re-payments (through Employee deductions) payable to the trustee of the 401(k) Plan was approximately $60,000. As of the Petition Date, Debtor's contributions to the 401(k) Plan and loan repayments (through Employee deductions) for January 2016 and the first week of February 2016 are outstanding. Debtor seeks authority to make these contributions and loan repayments (through Employee deductions). Debtor submits that it is essential for the morale and maintenance of trust of the Employees that necessary steps are taken to continue contributions and loan repayments (through Employee deductions) to the 401(k) Plan.

      e.    <u>Union Benefits</u>. Debtor employs three (3) union Employees in St. Louis who are paid weekly. Debtor funds health and welfare benefits and union dues for these

three employees through the Teamsters Local 682 Health & Welfare and Central States Pension Plan. Prior to the Petition Date, the average monthly contribution for these benefits was approximately $7,500. Debtor seeks authority to pay these benefits.

  f. <u>Administrative Service Providers</u>. As is customary in the case of most large companies in the ordinary course of business, Debtor uses third parties to administer the Employee Benefits and pay the Pre-Petition Wages (collectively, the "Administrative Service Providers"). In order to timely fund Debtor's payroll obligations, Debtor must transfer such funds to the appropriate Administrative Service Provider several days in advance. Debtor estimates that the average monthly cost of the Administrative Service Providers' services is approximately $9,000 in the aggregate. The continued support of the Administrative Service Providers is crucial to Debtor's ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting Debtor's Employee Benefit and Pre-Petition Wages obligations. Debtor believes that it is current with respect to amounts owing to the Administrative Service Providers; however, to the extent that any amounts remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a pre-Petition Date obligation, Debtor seeks to be authorized, but not directed, to pay such amounts.

  g. <u>Withholdings From Employee Paychecks</u>. Debtor may also be in possession of various withholdings from the Employees' paychecks, including, among other things, garnishments and child support payments (collectively, the "Withholdings"). It is likely that funds have been deducted from the Employees' wages have not yet been forwarded to the appropriate third-party recipients prior to the Petition Date. Without

authority to forward the Withholdings to the appropriate parties, Debtor exposes its officers and directors to personal liability. Accordingly, Debtor seeks authority to forward the Withholdings to the appropriate parties.

### **Relief Requested**

26. By the Motion, Debtor seek court authority to pay the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits at this time to ensure the morale of the Employees, and to prevent any interruption, through loss of the Employees, of its operations, and to prevent loss of its business and assets.

27. Code § 507(a)(4) provides employees of a Chapter 11 debtor with a priority claim for accrued but unpaid wages, salaries, commissions, vacation time, sick leave and related benefits. Specifically, Code § 507(a)(4) provides that the following expenses and claims have priority in the following order—

> (4) Fourth, allowed unsecured claims, but only to the extent of $12,475.00 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—
>
> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

28. In addition, Code § 507(a)(5) provides employees of a Chapter 11 debtor with a priority claim for contributions to employee benefits plans. Specifically, Code § 507(a)(5) provides that the following expenses and claims have priority in the following order—

> (5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
>
> > (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
> >
> > (B) for each such plan, to the extent of—
> >
> > > (i) the number of employees covered by each such plan multiplied by $12,475.00; less
> > >
> > > (ii) the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

29. Debtor seek to pay Pre-Petition Wages and Reimbursable Expenses that would otherwise be allowable under Code § 507(a)(4) or (5). Any proposed plan of reorganization would require Debtor to pay the Employees their Code § 507(a)(4) or (5) claims up to the statutory amount. As such, Debtor believes the granting of the relief requested herein would result in little or no prejudice to the creditors of the estate or any other party-in-interest.

30. In addition, payment of the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits is essential and necessary to maintain an adequate workforce to preserve Debtor's operations and assets. The purpose of the Motion is to ensure that Debtor is able to

avoid an interruption of its operations by ensuring the retention of Employees and the protection of employee-employer relations.

31. Absent an order granting the relief requested herein, Debtor's the Employees will undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations. Without the requested relief, the stability of Debtor will be greatly impacted by the possibility that the Employees will seek alternative employment. Thus, Debtor believes that the stability of Debtor's business will be undermined or severely damaged by the loss of the Employees needed to maintain Debtor's operations and assets.

32. Other courts have granted similar relief in order to prevent harm to Debtor and its estate. In, *In re Ionosphere Clubs*, *Inc*., 98 B.R. 174 (Bankr. S.D.N.Y. 1989), the bankruptcy court recognized "the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the...operation[s] of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176. *See also In Re Chateaugay Corp*, 80 B.R. 279 (Bankr. S.D.N.Y. 1987).

33. In addition, the Court's general equitable powers under Code § 105(a) empower the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175. Moreover, Code § 105(a) empowers a bankruptcy court to "permit pre-plan payment of a prepetition obligation when essential to the...operation[s] of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

34. As stated by this Court's sister district, "payment of the prepetition claims...is necessary to realize the possibility of a successful reorganization. Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the...operation[s] of the debtor." *In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001).

35. In addition to Code § 105(a), Code § 363(b) provides that Debtor, after notice and hearing, may "use, sell, or lease, other than in the ordinary course of business, property of the estate."

36. Debtor submits that the requested relief represents a sound exercise of Debtor's business judgment, is necessary to avoid immediate and irreparable harm and is warranted under Code § 363(b). Debtor has reached this conclusion by weighing the costs of paying the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits against the benefits of retaining its trained work force and avoiding the difficulty in finding similarly-qualified replacement employees willing to work for an entity in Chapter 11.

37. As such, it is in the best interests of Debtor's estate and its creditors to grant the relief requested in order to allow Debtor pay the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits, subject to the terms of the order sought in the DIP Motion and the Budget, so that it may ensure the retention the Employees and the maintenance of Debtor's normal business operations without further interruption. In the event Debtor is unable to pay the Employees as requested, the potential harm resulting from the loss of Employees, or loss in employee-employer relations, could have a serious impact on Debtor's ability to maintain the value of its assets.

### Necessity for Immediate Relief

38. Federal Rule of Bankruptcy Procedure 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21

days after the filing of the petition, grant ... (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition ...." Fed. R. Bank. P. 6003. The Third Circuit Court of Appeals has interpreted the "immediate and irreparable harm" language in the context of preliminary injunctions to mean a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3rd Cir. 2007). If Debtor is not permitted to continue its ordinary business operations by paying the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits, and to assure the Employees that authority has been granted to honor all such claims, immediate and irreparable harm will result. Accordingly, Debtor submits that for the reasons set forth herein, the relief requested is consistent with Bankruptcy Rule 6003.

WHEREFORE, Debtor requests that this Court enter an Order granting the Motion, authorizing, but not requiring, Debtor to pay the Pre-Petition Wages, Reimbursable Expenses and Employee Benefits immediately and granting any other relief at equity or law that this Court deems necessary.

Date: February 7, 2016

**SPENCER FANE LLP**

By: /s/ Lisa A. Epps
Scott J. Goldstein     MO Bar No. 28698
Lisa A. Epps     MO Bar No. 48544
Eric L. Johnson     MO Bar No. 53131
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Office: 816-474-8100
Facsimile: 816-474-3216
sgoldstein@spencerfane.com
lepps@spencerfane.com
ejohnson@spencerfane.com

PROPOSED COUNSEL FOR DEBTOR

WA 7763414.1