## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| **MID-STATES SUPPLY COMPANY, INC.,** | Case No. 16-_____ (___) |
| **Debtor.** | |

## MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AUTHORIZING AND APPROVING DEBTOR'S (I) RETENTION AND EMPLOYMENT OF WINTER HARBOR LLC AND (II) EMPLOYMENT OF STUART NOYES AS CHIEF RESTRUCTURING OFFICER

Debtor Mid-States Supply Company, Inc. ("Debtor"), files its Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtor's Retention and Employment of Winter Harbor LLC and (II) Employment of Stuart Noyes as Chief Restructuring Officer (the "Motion"). In support of the Motion, Debtor relies upon and incorporates by reference the Declaration of Stuart Noyes (the "Noyes Declaration") attached as **Exhibit A**, and respectfully states as follows:[1]

### Procedural Background

1.      On February 7, 2016 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri.

2.      Debtor remains in possession of its assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3.      An Official Committee of Unsecured Creditors has not yet been appointed.

---

[1]      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Engagement Letters (defined herein).

WA 7763429.1

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A).

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

### Debtor's Background

7.      Debtor supplies pipes, valves and fittings to ethanol, pipeline and power industries in the United States. It also offers hoses, tools, compounds, gauges and thermometers. In addition, Debtor provides compressed air, steam, process control and services, along with IT solutions, such as project and customer websites, PocketPC software, customer inventory management, integrated supply, order tracking system and communication options. Debtor's products are sold to a myriad of industries, including large industrial plant operations, food production, oil and gas pipeline transportation, mechanical construction and other large industrial players.

8.      Founded and headquartered in Kansas City, Missouri since 1947, Debtor, a family-owned company, operates out of 23 locations, certain of which branches operate under the "Midco" fictitious brand name, in the following states—Alabama, Colorado, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, Utah, West Virginia and Wyoming.  Debtor currently has approximately 228 employees.

9.      On September 1, 2011, Debtor entered into Credit and Security Agreement, as amended from time to time (the "Credit Agreement") with Wells Fargo Bank, National Association ("Wells Fargo"), under which it borrowed $45 million, which line grew with its growth to approximately $60 million.  Using the expanded availability from Wells Fargo, Debtor roughly doubled its sales and EBITDA from fiscal 2011 through today.  By 2015, a confluence of factors, including the demand for inventory with over 32,000 SKU's, no concentration in the customer base (meaning a broad demand for stocked product) and a rapid decline in the oil and

WA 7763429.1

gas sector, kept Debtor's inventory and payables at unsustainably high levels. These factors led Debtor's management to implement plans to right-size the business with respect to inventory, payables, rationalizing the customer base, operating expenses and tightly managing cash flow.

10.     As a result of various defaults under the Credit Agreement, on August 28, 2015, Debtor entered into its first forbearance agreement with Wells Fargo.  In connection with this forbearance agreement and Debtor's restructuring efforts, on August 25, 2015, Debtor engaged Stuart Noyes to act as its chief restructuring officer ("CRO")—Winter Harbor LLC ("Winter Harbor") had been providing financial advisory services to Debtor since May 2015.

11.     Since the first forbearance agreement with Wells Fargo, Debtor has entered into two other forbearance agreements with Wells Fargo, the most recent of which, dated December 28, 2015, expires by its terms on February 29, 2016 and contains numerous benchmarks (the "Benchmarks").   While Debtor and its CRO have been working tirelessly to restructure its business and meet the Benchmarks, Debtor has determined in its business judgment that filing the captioned bankruptcy case is in the best interest of its creditors.

### Relief Requested

12.     By the Motion, Debtor seeks entry of an Order under Code §§ 105(a) and 363(b), authorizing and approving: (i) the employment and retention of Winter Harbor to provide restructuring-management and advisory services in this Chapter 11 case, effective as of the Petition Date, pursuant to the Engagement Letters, as amended (defined herein), attached as **Exhibit B**, and (ii) the employment of Stuart Noyes as CRO, and any Additional Personnel (defined herein), effective as of the Petition Date.

### Winter Harbor's and Mr. Noyes' Qualifications

13.     Winter Harbor's professionals have a wealth of experience in providing corporate restructuring services. On May 21, 2015, on the basis of the qualifications of Winter Harbor's

3

professionals, Debtor entered into an agreement to retain Winter Harbor to provide financial advisory services (the "May Engagement Letter"). On August 25, 2015, Debtor engaged Winter Harbor to provide CRO services, pursuant to the engagement letter dated August 25, 2015 (the "August Engagement Letter," and together with the May Engagement Letter, the "Engagement Letters"). Since being engaged, Winter Harbor has developed a significant amount of institutional knowledge regarding Debtor's operations, finances and systems. On the basis of this experience and knowledge, Winter Harbor is uniquely positioned to provide the services described in the Engagement Letters.

14.     Debtor submits that the retention of Winter Harbor to provide Mr. Noyes as CRO, as well as the additional personnel set forth herein (the "Additional Personnel"), to be necessary and proper.

15.     Debtor selected Mr. Noyes as CRO based upon Mr. Noyes' (i) extensive experience in matters involving complex financial restructurings and sales of debtors' assets and (ii) excellent reputation for the services rendered in Chapter 11 cases on behalf of debtors and creditors throughout the United States. He is an expert in leading both CRO and interim-management assignments for debtor clients as well as advisory engagements for both debtor and creditor clients.

16.     In providing pre-petition services to Debtor in connection with these matters, Mr. Noyes has taken an active role in spearheading Debtor's efforts to prepare for its Chapter 11 filing, including negotiating post-petition financing and communicating with Debtor's various constituencies. Accordingly, Mr. Noyes has developed significant relevant experience and expertise regarding Debtor that will assist him in providing effective and efficient services in this Chapter 11 case.

WA 7763429.1

17.    If Debtor is not permitted to retain Winter Harbor and Mr. Noyes, Debtor would be forced to retain a new CRO not familiar with Debtor's financial affairs, business operations, and restructuring efforts given the terms and conditions of the debtor-in-possession financing and the use of cash collateral.  The time expended in locating and retaining a new financial advisory firm and CRO, and in bringing them up to speed, likely would delay and hinder Debtor's restructuring efforts.

## Scope of Services

18.    As set forth in the Engagement Letters, Winter Harbor has been providing and will continue to provide the following services, among others:

> a.    prepare analyses and data required under Debtor's financing documents;

> b.    in conjunction with Debtor's management, manage Debtor's cash, prepare ongoing forecasting of the cash flows and operations, and monitor and analyze operational and financial condition;

> c.    oversee the development of a business restructuring plan and potential sale of assets;

> d.    manage Debtor's negotiations with their creditor constituencies, including negotiations relating to Debtor's restructuring; and

> e.    provide such other services as necessary.

## Winter Harbor's Disinterestedness

19.    Although Debtor submits that the retention of Winter Harbor is not governed by Code § 327, the Noyes Declaration discloses, among other things, any relationship that Winter Harbor or Mr. Noyes has with Debtor, its significant creditors or other significant parties in interest known to Winter Harbor. If any new material facts or relationships are discovered or arise, Mr. Noyes will provide the Court with a supplemental declaration.

WA 7763429.1

20.    Winter Harbor has informed Debtor that, except as may be set forth in the Noyes Declaration, it (i) has no connection with Debtor, its creditors or other parties-in-interest in this Chapter 11 case; (ii) does not hold any interest adverse to Debtor's estate and (iii) believes it is a "disinterested person" as defined in Code § 101(14).

21.    Finally, Winter Harbor has agreed not to share with any person or firm the compensation to be paid for its services rendered in connection with this Chapter 11 case.

### Terms of Retention

22.    Pursuant to the terms set forth in the Engagement Letters, Debtor will compensate Winter Harbor as follows:[2]

a.    <u>Compensation</u>: Debtor has agreed to compensate Winter Harbor at its standard hourly rates during the pendency of the Chapter 11 case. The billing rates for professionals who may be assigned to this engagement are as follows:

| | |
|---|---|
| Managing Director | $495 per hour |
| Director | $395 per hour |
| Manager | $295 per hour |
| Clerical/Administrative | $75 per hour |

Winter Harbor anticipates that the staffing of Debtor's engagement will be as follows: Stuart Noyes ($495/hour), one Winter Harbor professional as Additional Personnel ($395/hour), and one or more Winter Harbor professionals as Additional Personnel ($295/hour).

b.    <u>Reimbursement of Expenses</u>: Out of pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at

---

[2]    To the extent there is any inconsistency in connection with the summary of the principal terms of the Engagement Letters set forth in this Motion and the principal terms as set forth in the Engagement Letters, the terms of the Engagement Letters shall control.

WA 7763429.1

the actual amounts incurred.  Out of pocket expenses may also include reasonable fees and expenses of attorneys consulted or engaged by Winter Harbor (engaged upon prior written notice by Winter Harbor to Debtor) to assist it with matters under the Engagement Letters, such as retention applications, fee applications and collection of fees under the Engagement Letters.

c.      Indemnification: Debtor will indemnify Winter Harbor, its principals, employees and affiliates in the event of certain losses, subject to the following limitations and notwithstanding the provisions of the Engagement Letters:

i.      Debtor is permitted to indemnify Winter Harbor and the Additional Personnel on the same terms as provided to (and not on terms more favorable than) Debtor's officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under Debtor's directors' and officers' liability policy.

ii.      During the course of this Chapter 11 case, all provisions in the Engagement Letters or elsewhere that attempt to limit Winter Harbor's liability to the amount of its fees (or a multiple thereof) shall be of no force or effect.

23.      Because Winter Harbor is not being retained as a professional under Code § 327, it will not be submitting fee applications pursuant to Code §§ 330 and 331. Instead, Debtor intends that the fees and expenses incurred by Winter Harbor in completion of its services under the Engagement Letters be treated as administrative expenses of Debtor's Chapter 11 estate and paid by Debtor in the ordinary course of business.  Winter Harbor will be entitled to be paid in full immediately upon invoicing Debtor, but will file with the Court and provide notice as required by any Order governing compensation procedures (the "Compensation Procedures

7

WA 7763429.1

Order"), reports of compensation and expenses on a quarterly basis.  Such reports shall include

the names and functions of the individuals assigned to this matter, and shall include detailed time

entries describing the task(s) performed—recorded in one-half hour increments—and organized

by project category. Such reports will also provide a time period for objections as to

compensation previously paid, and all compensation previously paid during such quarter will be

subject to review by the Court in the event an objection is filed.  Additionally, Winter Harbor

shall file with the Court and provide notice pursuant to the Compensation Procedures Order,

monthly reports of staffing on the engagement for the previous month. Debtor believes that

Winter Harbor's fees and compensation as set forth herein are reasonable and justified under the

circumstances.

### Pre-petition Fees and Expenses Paid Under the Engagement Letters

24.     Within the 90 days preceding the Petition Date, Winter Harbor billed Debtor and

received payment in the aggregate amount of $1,041,444.53.

### Indemnification

25.     Winter Harbor on the one hand and Debtor on the other negotiated the terms and

conditions of the Engagement Letters, including the provisions regarding indemnification of

Winter Harbor, at arms' length and in good faith. Debtor and Winter Harbor believe that the

indemnification language set forth in the Engagement Letters—as subject to the Motion—is

customary and reasonable for similar engagements in Chapter 11 cases and reflects the

qualifications and limitations on indemnification provisions that are customary.

### Basis for Relief Requested

26.     Debtor requests authority to retain Winter Harbor and Mr. Noyes under the terms

of the Engagement Letters pursuant to Code § 363(b), which provides in pertinent part: "The

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

WA 7763429.1

business property of the estate." Courts interpreting Code § 363(b) have held that transactions should be approved pursuant to this provision when, as here, they are supported by management's sound business judgment. *See, e.g., Meyers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bankr. v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" test for section 363(b)).

27.     The retention of corporate officers is proper under Code § 363.  Courts recognize the applicability of Code § 363(b) to the use of estate property to compensate individuals employed outside the ordinary course of business. *See In re First Int'l Services Corp.*, 25 B.R. 66, 69 (Bankr. D. Conn. 1982).  Indeed, courts have relied upon Code § 363(b) as the basis upon which to employ and compensate financial management services firms similar to Winter Harbor that provide professionals to serve as officers or other management-level personnel employed by the debtor. *See, e.g., In re BI-LO, LLC*, Case No. 09-02140-HB (Bankr. D.S.C. 2009)*; In re Spansion Inc.*, Case No. 09-10690 (KJC) (Bankr. D. Del. Apr. 13, 2009); *In re Verasun Energy Corp.*, Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 8, 2008); *In re DBSI, Inc.*, Case No. 08-12687 (PJW) (Bankr. D. Del. Dec. 17, 2008); *In re WorldSpace, Inc.*, Case No. 08-12412 (KJC) (Bankr. D. Del. Nov. 10, 2008); *In re Hines Horticulture, Inc.*, Case No. 08-11922 (KJC) (Bankr. D. Del. October 2, 2008); *In re Dan River Holdings, LLC*, Case No. 08-10726 (BLS) (Bankr. D. Del. May 19, 2008); *In re Hancock Fabrics, Inc.*, Case No. 07-10353 (BLS) (Bankr. D. Del. April 26, 2007); *In re Interstate Bakeries Corp.*, Case No. 04-45814 (JWV) (Bankr. W.D. Mo. October 25, 2004); *In re Safety-Kleen Cor*p., Case No. 00-2303 (PJW) (Bankr. D. Del.

WA 7763429.1

Oct. 4, 2001); *In re Harnischfeger Indus. Inc.*, Case No. 99-2171 (PJW) (Bankr. D. Del. Oct. 4,

2001).

28.     Debtor has determined, in the exercise of its business judgment, that the fee

structure set forth in the Engagement Letters appropriately reflects the nature of the services to

be provided by Winter Harbor and Mr. Noyes, contains reasonable terms and conditions of

employment and should be approved under Code § 363.

29.     Debtor has engaged Winter Harbor and Mr. Noyes to complete crucial time-

sensitive and work-intensive projects.   Winter Harbor and Mr. Noyes are providing services

currently, and the continued assistance of Winter Harbor and Mr. Noyes is crucial to the success

of Debtor's Chapter 11 case.   For example, Winter Harbor and Mr. Noyes will assist Debtor in

developing and implementing short-term cash flow forecasting.   Winter Harbor and Mr. Noyes

will work with senior management as well as other employees to ensure that Debtor complies

with the operational requirements imposed as a result of the filing of this Chapter 11 case.   In

addition, Winter Harbor and Mr. Noyes will assist other professionals sought to be retained by

Debtor by acting as a medium through which professionals can obtain information regarding the

Debtor.   Winter Harbor's and Mr. Noyes' role as a conduit to information enables the other

professionals in this Chapter 11 case to provide better service to Debtor during the early stages of

the case, thereby maximizing Debtor's going-concern value while simultaneously allowing

Debtor's senior management, as well as other employees, to concentrate on maintaining business

operations.   To provide such services in an effective manner, it will be necessary for Winter

Harbor and Mr. Noyes to take all appropriate actions immediately upon the filing of this Chapter

11 case.

WA 7763429.1

## Waiver of Bankruptcy Rule 6004(h)

30.      Debtor seeks a waiver of any stay of the effectiveness of the Order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, as has been set forth in the Motion.

WHEREFORE, Debtor respectfully requests the Court enter an order authorizing the Debtor to employ and retain Winter Harbor and Mr. Noyes and granting such further relief as is just and proper.

February 7, 2016

**SPENCER FANE LLP**

By: /s/ Lisa A. Epps
Scott J. Goldstein        MO Bar No. 28698
Lisa A. Epps              MO Bar No. 48544
Eric L. Johnson           MO Bar No. 53131
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Office: 816-474-8100
Facsimile: 816-474-3216
sgoldstein@spencerfane.com
lepps@spencerfane.com
ejohnson@spencerfane.com

PROPOSED COUNSEL FOR DEBTOR

WA 7763429.1

**Exhibit A**

**(Noyes Declaration)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | **Chapter 11** |
| **MID-STATES SUPPLY COMPANY, INC.,** | **Case No. 16-_____ (___)** |
| **Debtor.** | |

**DECLARATION OF STUART NOYES IN SUPPORT OF MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) AUTHORIZING AND APPROVING DEBTORS' (I) RETENTION AND EMPLOYMENT OF WINTER HARBOR LLC AND (II) EMPLOYMENT OF STUART NOYES AS CHIEF RESTRUCTURING OFFICER**

I, Stuart Noyes, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, to the best of my knowledge and belief, and after reasonable inquiry, as follows:

1.      I am a Managing Member of Winter Harbor LLC ("Winter Harbor"), a financial advisory services firm that maintains offices at 265 Franklin Street, 10th Floor, Boston, Massachusetts, 02110, and I make this declaration on behalf of Winter Harbor (the "Declaration"). I submit this declaration in support of the motion (the "Motion")[3] of the captioned debtor ("Debtor") for an order authorizing the retention of Winter Harbor and my designation as Chief Restructuring Officer ("CRO"). Unless otherwise stated in this Declaration, I have personal knowledge of the matters set forth herein.

2.      To the extent any information disclosed herein requires amendment or modification upon Winter Harbor's completion of further review or as additional party in interest

---

[3]      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Motion.

information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended or modified information.

3.      Winter Harbor is a preeminent financial advisory and turnaround management firm.  The professionals and employees at Winter Harbor have considerable experience advising clients around the world.  Winter Harbor has dedicated professionals who provide restructuring services to its clients.

4.      The current managing directors, directors, managers and associates of Winter Harbor have extensive experience working with financially troubled companies in complex financial restructurings, out-of-court and in Chapter 11 proceedings.  Winter Harbor and its principals have been involved as advisor to debtor, and creditor and equity constituencies in many reorganization cases.

5.      On May 21, 2015 and August 25, 2015, Debtor entered into the Engagement Letters.  Neither I nor Winter Harbor, nor any professional associated with Winter Harbor, has been engaged by any entity other than Debtor in connection with this Chapter 11 case.

6.      Winter Harbor is not a creditor of the Debtors. In the 90 days prior to the Petition Date, Winter Harbor billed the Debtors and received payment in the aggregate amount of $1,041,444.53.

7.      As of the Petition Date, Winter Harbor holds a retainer of $70,000 for post-petition services to be rendered and expenses to be incurred in connection with the captioned Chapter 11 case

8.      To the best of my knowledge and belief, insofar as I have been able to ascertain, none of the principals or employees of Winter Harbor working on or connected to this engagement on Debtor's behalf have had, or will have in the future, direct contact concerning

13

this Chapter 11 case with the potential parties in interest herein, the United States Trustee or anyone employed in the Office of the United States Trustee, other than in connection with this engagement for Debtor.

9.     Winter Harbor has researched its client database and performed reasonable due diligence to determine whether it had any relationships with the following "Interested Parties" provided to Winter Harbor by Debtor in this Chapter 11 case:

      a.    Debtor

      b.    Debtor's principals

      c.    Debtor's secured lenders with security interests in Debtor's cash

      d.    Debtor's 20 largest unsecured creditors, as identified in its Chapter 11 petition.

10.     From the internal search, Winter Harbor has discovered no connections with the Interested Parties, except that in the past, Wells Fargo Bank, National Association has engaged Winter Harbor to provide advisory services to it in matters wholly-unrelated to the captioned case. I do not believe that this connection represents a conflict in these proceedings.

11.     Winter Harbor is an advisory and crisis manager provider specifically in the areas of restructuring and distressed debt. As a result, Winter Harbor has and may in the future represent certain Interested Parties. None of those engagements or relationships relate to this Chapter 11 case.

12.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, other than in connection with these cases, neither I, nor Winter Harbor, nor any of its principals, employees, agents or affiliates, have any connection with Debtor, its creditors, the United States Trustee, or any other party with an actual or potential

14

interest in this Chapter 11 case, or their respective attorneys or accountants, except as set forth below:

a.     From time to time, Winter Harbor has provided services, and likely will continue to provide services, to certain creditors of Debtor and various other parties adverse to Debtor in matters unrelated to Debtor's Chapter 11 case. As described above, however, Winter Harbor has undertaken a detailed search to determine and to disclose whether it is providing or has provided services to any significant creditors, equity security holders, insiders or other parties in interest in such unrelated matters.

b.     Winter Harbor has provided services in connection with numerous cases, proceedings and transactions unrelated to Debtor's Chapter 11 case. These unrelated matters involve numerous attorneys, financial advisors and creditors, some of whom may be claimants or parties with actual or potential interest in this case or may represent such parties.

c.     Winter Harbor personnel may have business associations with certain creditors of Debtor unrelated to Debtor's Chapter 11 case. In addition, in the ordinary course of its business, Winter Harbor may engage counsel or other professionals in unrelated matters who now represent, or who may in the future represent, creditors or other interested parties in this Chapter 11 case.

13.     Other than as disclosed herein, Winter Harbor has no relationship with Debtor of which I am aware after due inquiry.

14.     To the best of my knowledge, Winter Harbor has not been retained to assist any entity or person other than Debtor on matters relating to, or in connection with, this Chapter 11 case. If the Court approves the proposed employment of Winter Harbor by Debtor, Winter

Harbor will not accept any engagement or perform any service for any entity or person other than Debtor in this Chapter 11 case. Winter Harbor will, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of Debtor or parties in interest in this Chapter 11 case; provided, however, that such services do not relate to, or have any direct connection with, this Chapter 11 case.

15.     To the best of my knowledge, information and belief, Winter Harbor does not have or represent any interest materially adverse to the interests of Debtor, or of any class of creditors or equity security holders of Debtor, by reason of any direct or indirect relationship to, connection with or interest in Debtor or any investment banker for any securities of Debtor, or for any other reason except as noted above.

16.     Despite efforts to identify and disclose Winter Harbor's connections with parties in interest in these cases, because Debtor operates a large enterprise with hundreds of creditors and other relationships, Winter Harbor is unable to state with certainty that every client relationship or other connection has been disclosed.  In this regard, if Winter Harbor discovers additional information that requires disclosure, Winter Harbor will file a supplemental disclosure with the Court.

17.     Winter Harbor submits that it holds no interest adverse to Debtor as to the matters for which it has been employed by Debtor.  Certain individuals affiliated with Winter Harbor may render crisis and interim-management services to Debtor on a part-time basis, while others will be engaged full-time.  To the extent such individuals are employed on a part-time basis, Winter Harbor submits that there are no simultaneous or prospective engagements existing which would constitute a conflict or adverse interest as to the matters for which it has been employed by Debtor.

18.    Winter Harbor reserves the right to supplement this Declaration in the event that Winter Harbor discovers any facts bearing on matters described in this Declaration regarding Winter Harbor's employment by Debtor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Date:    February 7, 2016

/s/ Stuart Noyes
Stuart Noyes
Managing Member—Winter Harbor LLC



**PROPRIETARY AND CONFIDENTIAL**

May 21, 2015

Ben Hurst
CEO
Mid-States Supply Company, Inc.
1716 Guinotte Ave
Kansas City, MO 64120

Re:    *Financial Advisory Services*

Dear Mr. Hurst:

We are pleased to set forth the terms of the engagement of Winter Harbor LLC ("Winter Harbor") by Mid-States Supply Company, Inc. ("Client" or "Company") to provide certain financial advisory services related to the Company's financial and liquidity situation.

*Objective and Scope*

The objectives and scope of this engagement will include work related to providing guidance to senior management and the Company's Board of Directors. This work may include the following:

- Assess the Company's current liquidity situation as it relates to the forecast
- Develop a critical vendor disbursement process / Daily Lender funding requests
- Build a 2 week cash flow
- Build a 13 week cash flow
- Update and roll forward the 13 week cash flow weekly against actuals
- Advise and assist in managing liquidity enhancement initiatives (AR, Inventory, Vendor payment plans, etc....)
- Negotiate short term and longer term agreement with the Lender (Wells Fargo) to provide "time" for the Company to consider various alternatives of restructuring.
- Advise the Company on these alternatives
- Develop a longer term cash flow and P&L forecast to support the planned restructuring alternative
- Assist management in evaluating its strategic options under a going concern, orderly wind-down or liquidation scenario.
- Test the impact of certain deviations from the forecast and the resulting impact to financial performance, liquidity and collateral

# EXHIBIT B

Mid-States Supply Company, Inc.
May 21, 2015

## *Our Services*

Our services will consist of the objective and scope as set forth above or modified as needed and agreed depending on the progress of the engagement.

The services we provide are intended solely for your use in connection with this engagement and should not be used or relied upon for any other purpose. Any written work product we prepare for you is to be used solely for purposes of this engagement and may not be published or used, in whole or in part, for any other purpose without our written permission.

Winter Harbor is a management consulting firm and not a CPA firm. Winter Harbor does not provide attest services, audits, or other engagements in accordance with standards established by the AICPA or auditing standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"). We will not audit any financial statements or perform attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.

## *Your Responsibilities*

In connection with our provision of services, you will perform the tasks, furnish the personnel, provide the resources, and undertake the responsibilities specified below.

You will designate an employee or employees within your senior management who will make or obtain all management decisions with respect to this engagement on a timely basis. You also agree to ensure that all assumptions set forth below are accurate and to provide us with such further information we may need and which we can rely on to be accurate and complete. We will be entitled to rely on all of your decisions and approvals and we will not be obligated to evaluate, advise on, confirm, or reject such decisions and approvals.

To help maximize the value of our work to you and to keep the project moving on schedule, you agree to comply with all of our reasonable requests and to provide us timely access to all information reasonably necessary to our performance of the services.

The successful delivery of our services, and the fees charged, are dependent on (i) your timely and effective completion of your responsibilities, (ii) the accuracy and completeness of any assumptions, and (iii) timely decisions and approvals by your management. You will be responsible for any delays, additional costs, or other liabilities caused by any deficiencies in the assumptions or in carrying out your responsibilities.

Except as stated in this Engagement Letter, the risk of loss with respect to the Company's operations and assets shall be borne by the Company.
Winter Harbor shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Company whether known or unknown, fixed or contingent accrued or un-accrued. Except as otherwise required by applicable law, any reference to the nature or results of Winter Harbor's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties.

Mid-States Supply Company, Inc.
May 21, 2015

In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, (a) the Company agrees to file an appropriate motion prepared in consultation with Winter Harbor as to matters relating to our retention by the Company and provision of Services as contemplated hereunder, as of the first day of the bankruptcy case, which seeks the approval of the assumption of this Agreement by the Company, and (b) this Agreement shall be subject to the entry of a final order of the Court approving the assumption of this Agreement  In the event, the order approving the Company's assumption of this Agreement or, if this Agreement is deemed not to be an executory contract, the order authorizing the engagement of Winter Harbor must be acceptable to Winter Harbor in its sole discretion.

*Fees and Expenses*

We will bill weekly on the actual hours worked and the following hourly billing rates (which may be subject to adjustment from time to time):

| *Title* | *Hourly Rate* |
|---|---|
| Founders / Managing Directors | $495 per hour |
| Director | $395 per hour |
| Manager | $295 per hour |

All invoices are due upon receipt.  Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred. In addition, Winter Harbor will apply a 1% administration fee on the total amount of each invoice to cover charges related to copying, printing, and other general administrative costs. Out of pocket expenses may also include reasonable fees and expenses of attorneys consulted or engaged by Winter Harbor (engaged upon prior written notice by Winter Harbor to Client) to assist it with matters under this Agreement in the event the Company files for protection under the US Bankruptcy Code, such as retention applications, fee applications, and collection of fees under this Agreement.

Payments for our services shall be by:

Wire transfer to:

Bank of America, N.A.
100 West 33rd Street
New York, NY 10001
Account Name: Winter Harbor LLC
Account #: ▮▮▮▮▮8148
Wire Routing/ABA #: 026009593
ACH Routing #: 011900254


Amounts remaining outstanding for more than 20 days (past due) will be subject to an interest charge of 1.5% per month from the date of invoice. We reserve the right to suspend further services until payment is received on past due invoices, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.  We understand that our bills should be sent to:

Mid-States Supply Company, Inc.
May 21, 2015


Ben Hurst
CEO
Mid-States Supply Company, Inc.
1716 Guinotte Ave
Kansas City, MO 64120
Ben.hurst@midstate.com

*Retainer*

We will require a retainer of $35,000 before we can commence work.  The retainer will either be applied to our final invoice to you at the conclusion of the engagement or will be promptly refunded to you at that time.

*Business Terms*

The attached General Business Terms apply to this engagement.

*     *     *     *     *     *

Please indicate your agreement with these terms by signing and returning to me the enclosed copy of this letter.  This engagement and the enclosed terms will become effective upon our receipt of your signed copy.  We appreciate the opportunity to be of service to you and look forward to working with you on this engagement.

Sincerely,

WINTER HARBOR LLC



By:  _____
     MEMBER AND MANAGING DIRECTOR

Attachments:   General Business Terms


Acknowledged and Accepted:

MID-STATES SUPPLY COMPANY, INC.

By:   _____

Title:  Vice President

Date:  5-26-15

Mid-States Supply Company, Inc.
May 21, 2015

**Attachment to Engagement Letter dated May 20, 2015 between
Winter Harbor LLC and Mid-States Supply Company, Inc.**

**GENERAL BUSINESS TERMS**

These General Business Terms, together with the Engagement Letter (including any and all attachments, exhibits and schedules) constitute the entire understanding and agreement (the "Agreement") between us with respect to the services and deliverables described in the Engagement Letter.  If there is a conflict between these General Business Terms and the terms of the Engagement Letter, these General Business Terms will govern, except to the extent the Engagement Letter explicitly refers to the conflicting term herein.

**1. Our Services and Deliverables** We will provide the services and furnish the deliverables (the "Services") as described in our Engagement Letter and any attachments thereto, as may be modified from time to time by mutual consent.

**2. Independent Contractor** We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our Services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, payroll and other applicable employee withholdings.

**3. Fees and Expenses** (a) Our fees and payment terms are set out in our Engagement Letter. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices.)

(b) You acknowledge that where out-of-town personnel are assigned to any project on a long-term basis (as defined from time to time in the applicable provisions of the Internal Revenue Code and related IRS regulations, and currently defined, under IRC Section 162, as a period of time reasonably expected to be greater than one year), the associated compensatory tax costs applied to out-of-town travel and living expenses also shall be calculated on an individual basis, summarized, and assessed to such personnel. In such cases, the expenses for which you shall reimburse us hereunder shall be deemed to include the estimated incremental compensatory tax costs associated with the out-of-town travel and living expenses of our personnel, including tax gross-ups. We shall use reasonable efforts to limit such expenses.

(c) We reserve the right to suspend Services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

**4. Taxes (a)** You will be responsible for and pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with our performance or your receipt of our Services, excluding taxes on our income generally.

(b) If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding.  You shall pay any such withholding to the applicable tax authority.  However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, you shall pay to us an amount equal to such withholding.  The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax.

**5. Confidentiality and Privacy** (a) With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure ("Confidential Information"), the other agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed, (v) disclosed pursuant to legal requirement or order, or (vi) disclosed to taxing authorities or to representatives and advisors in connection with tax filings, reports, claims, audits and litigation.

(b) Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping or quality assurance purposes and receiving party shall make no unauthorized use of such copies.

Mid-States Supply Company, Inc.
May 21, 2015

(c) We agree to use any personally identifiable information and data you provide us only for the purposes of this engagement and as you direct, and we will not be liable for any third-party claims related to such use. You agree to take necessary actions to ensure that you comply with applicable laws relating to privacy and/or data protection, and acknowledge that we are not providing legal advice on compliance with the privacy and/or data protection laws of any country or jurisdiction.

(d) We agree to keep the identity of the company confidential as well as the nature of the work undertaken with them in conjunction with this engagement. We understand the company's desire to keep this project confidential both currently and in the future and; therefore, agree to limit disclosure of the relationship and the project exclusively to those individuals and organizations having a direct interest in the project. At the time of entering into this agreement those individuals and organizations would include appropriate representatives of the company, Winter Harbor and the Lender.

**6. Our Deliverables and Your License** Upon full and final payment of all amounts due us in connection with this engagement, all right, title and interest in the deliverables set out in our Engagement Letter will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know-how and software ("Winter Harbor Property"), including such information as existed prior to the delivery of our Services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of Services for you. To the extent our deliverables to you contain Winter Harbor Property, upon full and final payment of all amounts due us in connection with this engagement, we grant you a non-exclusive, non-assignable, royalty-free, perpetual license to use it in connection with the deliverables and the subject of the engagement and for no other or further use without our express, prior written consent. If our deliverables are subject to any third party rights in software or intellectual property, we will notify you of such rights. Our deliverables are to be used solely for the purposes intended by this engagement and may not be disclosed, published or used in whole or in part for any other purpose.

**7. Your Responsibilities.** To the extent applicable, you will cooperate in providing us with office space, equipment, data and access to your personnel as necessary to perform the Services. You shall provide reliable, accurate and complete information necessary for us to adequately perform the Services and will promptly notify us of any material changes in any information previously provided. You acknowledge that we are not responsible for independently verifying the truth or accuracy of any information supplied to us by or on behalf of you.

**8. Our Warranty.** We warrant that our Services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 10 days after the Services are performed or delivered. The notice will specify and detail the non-conformance and we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY DISCLAIMED.

**9. Liability and Indemnification** (a) This engagement is not intended to shift risk normally borne by you to us. To the fullest extent permitted under applicable law, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against us by a third party, including a subpoena or court order, arising from or relating to any Services that you use or disclose, or this engagement generally. This indemnity shall not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(b) We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an

Mid-States Supply Company, Inc.
May 21, 2015

amount equal to the fees (excluding taxes and expenses) we receive from you for the portion of the engagement giving rise to such liability.

(c) Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

**10. Non-Solicitation** During the term of this engagement, and for a period of one year following its expiration or termination, you will not directly or indirectly solicit, employ or otherwise engage any of our employees (including former employees) or contractors who were involved in the engagement.

**11. Termination**

(a) Termination for Convenience. Either party may terminate this Agreement for convenience at any time on 30 days' prior written notice to the other.

(b) Termination for Breach. Either party may terminate this Agreement for breach if, within 15 days' notice, the breaching party fails to cure a material breach of this Agreement.

(c) To the extent you terminate this Agreement for convenience, you will pay us for all Services rendered, effort expended, expenses incurred, contingent fees (if any), or commitments made by us to the effective date of termination. To the extent you terminate this Agreement for breach, you will pay us for all conforming Services rendered and reasonable expenses incurred by us to the effective date of the termination.

(d) Further, we reserve the right to terminate this Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment, would impair our ability to perform the Services objectively.

(e) The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

**12. General** (a) This Agreement supersedes all prior oral and written communications between us, and may be amended, modified or changed only in a writing when signed by both parties.

(b)     No term of this Agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)     We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration will be conducted in Westport, Connecticut. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Connecticut for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(e)     If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

(f)     This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement

* * *



## PROPRIETARY AND CONFIDENTIAL

August 25, 2015

Ben Hurst
CEO
Mid-States Supply Company, Inc.
1716 Guinotte Ave
Kansas City, MO 64120

Re:    *Chief Restructuring Officer Services*

Dear Mr. Hurst:

We are pleased to set forth the terms of the engagement of Winter Harbor LLC ("Winter Harbor") by Mid-States Supply Company, Inc. or the "Company"), to provide certain services of a Chief Restructuring Officer ("CRO") and other support services.

*Objective and Scope*

As directed by the Board, the CRO and additional personnel shall provide the Company with, without limitation, the following services:

1. Compile data and analyses necessary to meet the reporting requirements requested by the Company's Lender; and assist with other aspects of managing the interactions with the Lender, including covenant compliance, communications, preparation for meetings and following up on requests.

2. Oversee the on-going forecasting of the Company's cash flows and its operations and monitor and analyze operational and financial condition.

3. Manage the Company's daily cash management activities.

4. Oversee the development of a business restructuring plan that demonstrates mid and long term viability supported by reasonable assumptions in its financial future.

5. Assist in execution of operational restructuring initiatives within the restructuring plan with Board's approval.

6. Identify, oversee and manage the execution of profit and cash improvement projects.

7. Lead forbearance and restructuring arrangements with the Lender.

8. Manage the Company's negotiations with its creditor constituencies, including negotiations relating to the Company's restructuring plan.

9. Advise the Board on restructuring matters and potential sale of assets.

10. Provide other services as requested or directed by the Board.

*Our Services*

Winter Harbor will make available to the Company the services of the CRO (CRO services to be performed by Stuart Noyes, Managing Director) with the assistance of additional Winter Harbor professionals. The CRO will have discretion over staffing resources on the engagement. Winter Harbor shall cause the CRO to perform his respective duties and responsibilities in a diligent, efficient, and faithful manner and to the best of his abilities. The CRO shall be responsible for the scope as set forth above, in accordance with the Company's by-laws and in compliance with applicable provisions of state law. The CRO will report to, and serve at the pleasure of, the Board of Directors during the term of this engagement. The CRO shall be responsible for leading the verification and implementation of the restructuring initiatives.

Winter Harbor may provide additional services beyond those described herein, if agreed upon by Winter Harbor and the Board of Directors or its designated committee. You agree to pay for such additional work at Winter Harbor's current rates. It is understood and agreed that the CRO will not be involved in any decision by the Company to use Winter Harbor for such additional services.

This engagement will begin upon the appointment by the Board of Directors based upon the execution of this Agreement.

Our services will consist of the objective and scope as set forth above or modified as needed and agreed depending on the progress of the engagement.

The services we provide are intended solely for your use in connection with this engagement and should not be used or relied upon for any other purpose. Any written work product we prepare for you is to be used solely for purpose of this engagement and may not be published or used, in whole or in part, for any other purpose without our written permission.

Winter Harbor is a management consulting firm and not a CPA firm. Winter Harbor does not provide attest services, audits, or other engagements in accordance with standards established by the AICPA or auditing standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"). We will not audit any financial statements or perform attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.

*Your Responsibilities*

In connection with our provision of services, you will perform the tasks, furnish the personnel, provide the resources, and undertake the responsibilities specified below.

You agree to cause all levels of your employees and contractors to cooperate fully and timely with us. You also agree to provide us with any information we may need and which we can rely on to be accurate and complete.

To help maximize the value of our work to you and to keep the project moving on schedule, you agree to comply with all of our reasonable requests and to provide us timely access to all information reasonably necessary to our performance of the services.

You agree to provide all Winter Harbor personnel acting as officers of the Company the most favorable indemnities provided by the Company to its officers and directors, whether under the Company's by-laws, partnership agreement, by contract or otherwise. This indemnification is in addition to the indemnification afforded Winter Harbor under the attached General Business Terms. Except as stated in this engagement, the risk of loss with respect to the Company's operations and assets shall be borne by the Company. Winter Harbor shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Company whether known or unknown, fixed or contingent accrued or un-accrued. Except as otherwise required by applicable law, any reference to the nature or results of Winter Harbor's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties.

You also agree to add Stuart Noyes as a named insured under your Directors and Officers Liability ("D&O") policy. The Company shall maintain D&O coverage with limits not less than $5 million and if it fails to do so, , Winter Harbor may secure coverage and you agree to reimburse Winter Harbor for the cost of such policy.

In the event the Company files for relief under Chapter 11 of Bankruptcy Code, (a) the Company agrees to file an appropriate motion prepared in consultation with Winter Harbor as to matters relating to our retention by the Company and provisions of Services as contemplated hereunder, as of the first day of the bankruptcy case, which seeks the approval of the assumption of this Agreement by the Company, and (b) this Agreement shall be subject to the entry of a final order of the Court approving the assumption of this Agreement. In the event, the order approving the Company's assumption of this Agreement or, if this Agreement is deemed not to be an executor contract, the order authorizing the engagement Winter Harbor must be acceptable to Winter Harbor in its sole discretion.

*Fees and Expenses*

We will bill weekly based on the actual hours worked and at the following hourly billing rates (which may be subject to adjustment from time to time):

| *Title* | *Hourly Rate* |
| --- | --- |
| Managing Director | $495 |

|            |       |
|------------|-------|
| Director   | $395  |
| Manager    | $295  |

Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

We will require an additional retainer of $35,000 for the CRO engagement. The retainer will either be applied to our final invoice to you at the conclusion of the engagement or will be promptly refunded to you at that time. Total retainer held upon receipt of the above payment will be $70,000.

Payments for our services shall be by:

Wire transfer to:

Bank of America, N.A.
100 West 33rd Street
New York, NY 10001
Account Name: Winter Harbor LLC
Account #: ████████8148
Wire Routing/ABA #: 026009593
ACH Routing #: 011900254

Our invoices are due upon presentation. Undisputed amounts remaining outstanding for more than 20 days (past due) will be subject to an interest charge of 1.5% per month from the date of invoice. We reserve the right to suspend further services until payment is received on past due invoices, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension. We understand that our bills should be sent to:

Ben Hurst
CEO
Mid-States Supply Company, Inc.
1716 Guinotte Ave
Kansas City, MO 64120

*Business Terms*

The attached General Business Terms apply to this engagement.

\* \* \* \* \* \*

Please indicate your agreement with these terms by signing and returning to me the enclosed copy of this letter. This engagement and the enclosed terms will become effective upon our receipt of your signed copy. We appreciate the opportunity to be of service to you and look forward to working with you on this engagement.

Sincerely,

WINTER HARBOR LLC

By: _____

MEMBER AND MANAGING DIRECTOR

Attachments:   General Business Terms

Acknowledged and Accepted:

MID-STATES SUPPLY COMPANY, INC.

By: _____

Title: _____

Date: _____

**Attachment to Engagement Letter dated July 21, 2015 between
Winter Harbor LLC ("us") and Mid-States Supply Company, Inc. ("you")**

## GENERAL BUSINESS TERMS

These General Business Terms, together with the Engagement Letter (including any and all attachments, exhibits and schedules) constitute the entire understanding and Agreement (the "Agreement") between us with respect to the services and deliverables described in the Engagement Letter. If there is a conflict between these General Business Terms and the terms of the Engagement Letter, these General Business Terms will govern, except to the extent the Engagement Letter explicitly refers to the conflicting term herein.

**1. Our Services and Deliverables** We will provide the services and furnish the deliverables (the "Services") as described in our Engagement Letter and any attachments thereto, as may be modified from time to time by mutual consent.

**2. Independent Contractor** We are an independent contractor and not your employee, agent, joint venture or partner, and will determine the method, details and means of performing our Services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, payroll and other applicable employee withholdings.

**3. Fees and Expenses** (a) Our fees and payment terms are set out in our Engagement Letter. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices.)

(b) You acknowledge that where out-of-town personnel are assigned to any project on a long-term basis (as defined from time to time in the applicable provisions of the Internal Revenue Code and related IRS regulations, and currently defined, under IRC Section 162, as a period of time reasonably expected to be greater than one year), which will be the case only with the prior approval of your Board of Directors, the associated compensatory tax costs applied to out-of-town travel and living expenses also shall be calculated on an individual basis, summarized, and assessed to such personnel. In such cases, the expenses for which you shall reimburse us hereunder shall be deemed to include the estimated incremental compensatory tax costs associated with the out-of-town travel and living expenses of our personnel, including tax gross-ups. We shall use reasonable efforts to limit such expenses.

(c) We reserve the right to suspend Services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

**4. Taxes (a)** You will be responsible for and pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with our performance or your receipt of our Services, excluding taxes on our income generally.

(b) If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax.

**5. Confidentiality and Privacy** (a) With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure ("Confidential Information"), the other agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed, (v) disclosed pursuant to legal requirement or order, or (vi) disclosed to taxing authorities or to representatives and advisors in connection with tax filings, reports, claims, audits and litigation.

(b) Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping or quality assurance purposes and receiving party shall make no unauthorized use of such copies.

(c) We agree to use any personally identifiable information and data you provide us only for the purposes of this engagement and as you direct, and we will not be liable for any third-party claims related to such use. You agree to take necessary actions to ensure that you comply with applicable laws relating to privacy and/or data protection, and acknowledge that we are not providing legal advice on compliance with the privacy and/or data protection laws of any country or jurisdiction.

(d) We agree to keep the identity of the company confidential as well as the nature of the work undertaken with them in conjunction with this engagement. We understand the company's desire to keep this project confidential both currently and in the future and; therefore, agree to limit disclosure of the relationship and the project exclusively to those individuals and organizations having a direct interest in the project. At the time of entering into this agreement those individuals and organizations would include appropriate representatives of the company, Winter Harbor and the Lender.

**6. Our Deliverables and Your License** Upon full and final payment of all amounts due us in connection with this engagement, all right, title and interest in the deliverables set out in our Engagement Letter will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know-how and software ("Winter Harbor Property"), including such information as existed prior to the delivery of our Services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of Services for you. To the extent our deliverables to you contain Winter Harbor Property, upon full and final payment of all amounts due us in connection with this engagement, we grant you a non-exclusive, non-assignable, royalty-free, perpetual license to use it in connection with the deliverables and the subject of the engagement and for no other or further use without our express, prior written consent. If our deliverables are subject to any third party rights in software or intellectual property, we will notify you of such rights. Our deliverables are to be used solely for the purposes intended by this engagement and may not be disclosed, published or used in whole or in part for any other purpose.

**7. Your Responsibilities.** To the extent applicable, you will cooperate in providing us with office space, equipment, data and access to your personnel as necessary to perform the Services. You shall provide reliable, accurate and complete information necessary for us to adequately perform the Services and will promptly notify us of any material changes in any information previously provided. You acknowledge that we are not responsible for independently verifying the truth or accuracy of any information supplied to us by or on behalf of you.

**8. Our Warranty** We warrant that our Services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 30 days after the Services are performed or delivered. The notice will specify and detail the non-conformance and we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE. ALL OF WHICH ARE HEREBY DISCLAIMED.

**9. Liability and Indemnification** (a) This engagement is not intended to shift risk normally borne by you to us. To the fullest extent permitted under applicable law, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against us by a third party, including a

subpoena or court order, arising from or relating to any Services that you use or disclose, or this engagement generally. This indemnity shall not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(b) We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an amount equal to the fees (excluding taxes and expenses) we receive from you for the portion of the engagement giving rise to such liability.

(c) Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

**10. Non-Solicitation** During the term of this engagement, and for a period of one year following its expiration or termination, you will not directly or indirectly solicit, employ or otherwise engage any of our employees (including former employees) or contractors who were involved in the engagement.

**11. Termination**

(a) Termination for Convenience. Either party may terminate this Agreement for convenience at any time by written notice to the other.

(b) To the extent either party terminates this Agreement, you will pay us for all conforming Services rendered and reasonable expenses incurred by us to the effective date of the termination.

(c) The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

**12. General** (a) This Agreement supersedes all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by both parties.

(b)     No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)     We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of Missouri without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration will be conducted in Chicago, Illinois. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Connecticut and the State of Missouri for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(e)     If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

(f)     This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement

* * *