IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| MID-STATES SUPPLY COMPANY, INC., | Case No. 16-_____ (___) |
| Debtor. | |

## APPLICATION FOR ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF SSG ADVISORS, LLC AND FRONTIER INVESTMENT BANC CORPORATION AS DEBTOR'S INVESTMENT BANKERS PURSUANT TO 11 U.S.C. § 327

Debtor Mid-States Supply Company, Inc. ("Debtor"), submits it Application for Order Authorizing Retention and Employment of SSG Advisors, LLC ("SSG") and Frontier Investment Banc Corporation ("Frontier") as Debtor's Investment Bankers (collectively, "Investment Banker") pursuant to 11 U.S.C. § 327 (the "Application"), effective as of the Petition Date (as defined below). In support of the Application, Debtor submits the Declaration of J. Scott Victor (the "Victor Declaration"), which is attached as **Exhibit A**, and the Declaration of Patrick J. Trysla (the "Trysla Declaration," and together with the Victor Declaration, the "Declarations"), which is attached as **Exhibit B**. In further support of the Application, Debtor respectfully represents as follows:

### Procedural Background

1.      On February 7, 2016 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri.

2.      Debtor remains in possession of its assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3.      An Official Committee of Unsecured Creditors has not yet been appointed.

WA 7763426.1

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A).

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

### Debtor's Background

7.      Debtor supplies pipes, valves and fittings to ethanol, pipeline and power industries in the United States. It also offers hoses, tools, compounds, gauges and thermometers. In addition, Debtor provides compressed air, steam, process control and services, along with IT solutions, such as project and customer websites, PocketPC software, customer inventory management, integrated supply, order tracking system and communication options. Debtor's products are sold to a myriad of industries, including large industrial plant operations, food production, oil and gas pipeline transportation, mechanical construction and other large industrial players.

8.      Founded and headquartered in Kansas City, Missouri since 1947, Debtor, a family-owned company, operates out of 23 locations, certain of which branches operate under the "Midco" fictitious brand name, in the following states—Alabama, Colorado, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, Utah, West Virginia and Wyoming. Debtor currently has approximately 228 employees.

9.      On September 1, 2011, Debtor entered into a Credit and Security Agreement, as amended from time to time (the "Credit Agreement") with Wells Fargo Bank, National Association ("Wells Fargo"), under which it borrowed $45 million, which line grew with its growth to approximately $60 million. Using the expanded availability from Wells Fargo, Debtor roughly doubled its sales and EBITDA from fiscal 2011 through today. By 2015, a confluence of factors, including the demand for inventory with over 32,000 SKU's, no concentration in the customer base (meaning a broad demand for stocked product) and a rapid decline in the oil and

WA 7763426.1

gas sector, kept Debtor's inventory and payables at unsustainably high levels. These factors led Debtor's management to implement plans to right-size the business with respect to inventory, payables, rationalizing the customer base, operating expenses and tightly managing cash flow.

10.    As a result of various defaults under the Credit Agreement, on August 28, 2015, Debtor entered into its first forbearance agreement with Wells Fargo.  In connection with this forbearance agreement and Debtor's restructuring efforts, on August 25, 2015, Debtor engaged Stuart Noyes to act as its chief restructuring officer ("CRO")—Winter Harbor LLC ("Winter Harbor") had been providing financial advisory services to Debtor since May 2015.

11.    Since the first forbearance agreement with Wells Fargo, Debtor has entered into two other forbearance agreements with Wells Fargo, the most recent of which, dated December 28, 2015, expires by its terms on February 29, 2016 and contains numerous benchmarks (the "Benchmarks").  While Debtor and its CRO have been working tirelessly to restructure its business and meet the Benchmarks, Debtor has determined in its business judgment that filing the captioned bankruptcy case is in the best interest of its creditors.

### Relief Requested

12.    By the Application, Debtor seeks entry of an order authorizing the retention and employment of Investment Banker, effective as of the Petition Date, as investment banker, pursuant to Code §§ 327(a) and 328(a). The terms of the proposed retention are set forth in an engagement agreement between Debtor and Investment Banker, dated January 27, 2016, a copy of which is attached as **Exhibit C** and incorporated by reference (the "Engagement Agreement").

### Investment Banker's Qualifications

13.    Debtor selected SSG based on its experience and expertise in providing investment banking services in Chapter 11 cases. Moreover, SSG has significant experience advising sellers and purchasers in the industrial sector at large. In addition, SSG's investment-

WA 7763426.1

banking professionals have extensive experience in advising debtors in Chapter 11 cases and have served as investment bankers to numerous debtors, Chapter 11 trustees, creditors' committees and buyers in Chapter 11 proceedings, including, but not limited to, *In re SW Liquidation, LLC (f/k/a Saladworks, LLC)*, Case No. 15-10327 (LSS); In *re Seegrid Corp.,* Case No. 14-12391 (BLS); *In re PMGI Holdings Inc.*, Case No. 13-12404 (CSS); *In re MSD Performance, Inc.,* Case No. 13-12286 (PJW); and *In re Cylex Inc.,* Case No. 12-13259 (BLS).

14.     Debtor selected Frontier based on its experience and expertise in providing investment banking services in the industrial sector and its track record of successful engagements for Debtor in the past.  For example, Frontier has intimate knowledge of Debtor and its operations based on its prior engagements with Debtor, including successfully obtaining new financing in 2011 finding parties interested in potentially acquiring Debtor more recently. In its business judgment, Debtor believes that that the synergies brought to the sale process by SSG and Frontier will benefit the estate.  Further, Debtor submits that the fee structure described herein is what a single investment banker would require, so Debtor is not being "double-billed," so to speak, by engaging two investment bankers.

## SERVICES TO BE PROVIDED

15.     As more fully set forth in the Engagement Agreement, the services Investment Banker will provide to Debtor shall include but shall not be limited to:

a.     Sale.  Investment Banker's role in connection with a Sale would include the following:

- Preparing an information memorandum describing Debtor, its historical performance including existing operations, facilities, contracts, customers, management and projected financial results and operations;

- Assisting Debtor in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by Debtor;

WA 7763426.1

- Coordinating the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

- Assisting Debtor in coordinating site visits for interested buyers and working with the management team to develop appropriate presentations for such visits;

- Soliciting competitive offers from potential buyers;

- Advising and assisting Debtor in structuring the transaction and negotiating the transaction agreements;

- Providing testimony in support of the sale; and

- Otherwise assisting Debtor and its counsel as necessary through closing on a best efforts basis.

b.     <u>Financing</u>.   Investment Banker's role in connection with the Financing will include the following:

- Preparing an information memorandum describing Debtor, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management, and financial projections;

- Assisting Debtor in compiling a data room of any necessary and appropriate documents related to the Financing;

- Assisting Debtor in developing a list of suitable potential lenders and investors who will be contacted on a discreet and confidential basis after approval by Debtor;

- Coordinating the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

- Assisting Debtor in coordinating site visits for interested lenders and investors and working with the management team to develop appropriate presentations for such visits;

- Soliciting competitive offers from potential lenders and investors;

- Advising and assisting Debtor in structuring the Financing and negotiating the lending and/or investment agreements; and

- Otherwise assisting Debtor and its other professionals, as necessary, through closing on a best efforts basis.

WA 7763426.1

c.    <u>Restructuring</u>.    Investment  Banker's  role  in  connection  with  a

Restructuring will include the following:

- Negotiating  and  assisting  Debtor  and  Debtor's  counsel  in  reviewing
  secured debt documents and meeting with lenders, lessors, and/or critical
  creditors regarding long term extension agreements and other restructuring
  arrangements;

- Working with critical vendors to secure alternatives and credit; and

- Otherwise  assisting  Debtor  and  its  other  professionals,  as  necessary,
  through closing on a best efforts basis.

16.    Debtor believes that Investment Banker is well qualified and able to provide the

foregoing services to Debtor. Investment Banker has indicated a willingness to act on behalf of

Debtor on the terms described herein.

## PROFESSIONAL COMPENSATION

17.    Investment Banker's decision to advise and assist Debtor is conditioned on its

ability to be retained in accordance with its customary terms and conditions of employment and

to be compensated for its services and reimbursed for the expenses it incurs in accordance with

its customary billing practices.

18.    In  summary,  the  fee  structure  provides  for  the  following  compensation  to

Investment Banker:

a.    <u>Initial Fee.</u> An initial fee of $30,000 ("Initial Fee"), which was due upon

signing of the Engagement Agreement and has already been paid.

b.    <u>Monthly Fees.</u> Monthly fees (the "Monthly Fees") of $25,000 per month.

c.    <u>Sale Fee</u>. Upon  the  consummation  of  a  Sale  Transaction,[1]  Investment

Banker shall be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via

wire transfer or certified check, at and as a condition of closing of such Sale, equal to the

---

[1] Capitalized terms not defined herein shall have the meaning as set forth in the Engagement Letter.

WA 7763426.1

greater of (i) $500,000 or (ii) two and one-half percent (2.5%) of Total Consideration. If the Sale Transaction takes the form of a liquidation of Debtor, the Sale Fee shall be $250,000.

           d.     <u>Financing Fee</u>. Upon the closing of a Financing Transaction, Investment Banker shall be entitled to a fee (the "Financing Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Financing equal to the greater of (i) $500,000 or (ii) two and one-half percent (2.5%) of any Senior Debt raised from any source plus six percent (6.0%) of any Tranche B, Traditional Subordinated Debt or Equity raised regardless of whether Debtor chooses to draw down the full amount of the Financing.

           e.     <u>Restructuring Fee</u>. Upon the closing of a Restructuring Transaction, Investment Banker shall be entitled to a fee ("Restructuring Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing such Restructuring equal to $500,000.

           f.     In addition to the foregoing Fees, whether or not a Transaction is consummated, Investment Banker will be entitled to reimbursement for all of its reasonable out-of-pocket expenses incurred in connection with the subject matter of this engagement.

19.     SSG and Frontier's fee sharing is subject to a side letter agreement between SSG and Frontier. SSG and Frontier have agreed to split the compensation as follows: (i) SSG will receive sixty percent (60%) and Frontier will receive forty percent (40%) of the Monthly Fees and any Transaction Fee; and (ii) SSG will receive fifty percent (50%) and Frontier will receive fifty percent (50%) of the Initial Fee. Other than as disclosed herein, SSG and Frontier have

WA 7763426.1

agreed not to share with any person or firm the compensation to be paid for their services rendered in connection with this Chapter 11 case.

20.    Debtor believes that the compensation structure described above is (i) comparable to compensation generally charged by investment banking firms of similar stature to Investment Banker for comparable engagements, both in and out of bankruptcy proceedings, and (ii) reflects a typical fee structure for Investment Banker and other leading investment banking firms, which do not bill their clients on an hourly basis but are generally compensated on a transactional basis.

21.    The hours worked, the results achieved, and the ultimate benefit to Debtor of the work performed by Investment Banker in connection with this engagement may vary, and Debtor has taken this into account in setting the above fees.

22.    Investment Banker's restructuring expertise, as well as its knowledge of capital markets, financing skills, knowledge and experience within the industrial sector, and mergers-and- acquisitions capabilities, some or all of which may be required by Debtor during the term of Investment Banker's engagement, were important factors to Debtor in determining the amount of Investment Banker's fees, and Debtor believes that the ultimate benefit to Debtor of Investment Banker's services cannot be measured merely by reference to the number of hours to be expended by its professionals in the performance of such services.

23.    Debtor seeks authority to compensate Investment Banker pursuant to Code §§ 327 and 328 and Federal Rule of Bankruptcy Procedure 2014. Debtor requests that the proposed compensation for Investment Banker set forth in the Engagement Agreement, including the Monthly Fees and any Transaction Fees, be approved pursuant to Code § 328(a). Code § 328(a) provides, in part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 … on any reasonable terms and

8

WA 7763426.1

conditions of employment, including on a ... fixed or percentage fee basis." Aside from the Initial and Monthly Fees, any Transaction Fees earned by Investment Banker would only be paid upon the closing of an applicable financing, restructuring or sale transaction. Finally, under Code § 328(a), all of such fees paid to Investment Banker would be reviewable "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time" the Application was approved.

### DISINTERESTEDNESS

24.      To the best of Debtor's knowledge and based upon the Declarations, SSG and Frontier are both a "disinterested persons" as that term is defined in Code § 101(14).

25.      To the best of Debtor's knowledge and based upon the Declarations, SSG and Frontier do not hold or represent an interest adverse to Debtor's estate. To the best of Debtor's knowledge and based upon the Declarations, (1) SSG and Frontier's connections to Debtor, creditors and any other party in interest are disclosed in the Declarations and (2) SSG, Frontier and their respective professionals working on this matter are not relatives of, and do not have connections with, the United States Trustee, or any known employee in the office thereof, or the United States Bankruptcy Judges for the Western District of Missouri.

26.      SSG and Frontier have not provided, and will not provide, any professional services to any of the creditors, parties in interest, or their respective attorneys and accountants with regard to any matter related to this Chapter 11 case.

27.      In 2004, Frontier was engaged by Debtor to market the Company for a potential sale. In 2011, Frontier was engaged by Debtor on a refinancing transaction, for which it was paid in full in 2011. Frontier also entered into an engagement letter with Debtor in October 2015, but that engagement letter has been superseded by the Engagement Agreement.

WA 7763426.1

## INDEMNIFICATION AND LIMITATION OF LIABILITY

28.    The Engagement Agreement provides that Debtor agrees to indemnify, defend, and hold harmless SSG, Frontier and any affiliates, the respective partners, members, directors, officers, agents, and employees and each other person, if any, controlling SSG and Frontier (collectively, the "Indemnified Parties") from and against all losses, claims, damages, liabilities, or costs, as and when incurred, in any way related to SSG and Frontier acting for Debtor under the Engagement Agreement.  Debtor will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto.

## BASIS FOR RELIEF REQUESTED

29.    Code § 327(a) provides that subject to Court approval, a debtor "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title." In addition, Code § 328(a) provides, in relevant part, that a debtor, subject to court approval, may employ a professional person under Code § 327 "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, *on a fixed or percentage fee basis, or on a contingent fee basis*." 11 U.S.C. § 328(a) (emphasis added). Thus, Code § 328(a) permits this Court to approve the terms of Investment Banker's engagement as set forth in the Engagement Agreement.

30.    Debtor submits that the fee structure, expense reimbursements and indemnification provisions are reasonable terms and conditions of employment under Code

10                                    WA 7763426.1

§ 328(a) in light of the following: (a) the nature and scope of services to be provided by Investment Banker; (b) industry practice with respect to the fee structures and indemnification provisions typically utilized by leading investment banks and investment bankers that do not bill their clients on an hourly basis; (c) market rates charged for comparable services both in and out of the Chapter 11 context; and (d) Investment Banker's substantial experience with respect to financial restructuring and investment banking.

31.    The terms of the Engagement Agreement were negotiated in good faith and at arms' length between Debtor and Investment Banker and reflect Debtor's evaluation of Investment Banker's investment banking expertise and of the extensive work that will be performed. Debtor acknowledges and agrees that the fee structure was agreed upon by the parties in anticipation of a substantial professional commitment of time and effort by Investment Banker and its professional staff under the Engagement Agreement, and in light of the fact that such commitment may foreclose other opportunities for Investment Banker and its professional staff and that the actual time and commitment required of Investment Banker and its professional staff to perform the services under the Engagement Agreement may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

32.    Debtor proposes that, notwithstanding Investment Banker's retention under Code § 328(a), the United States Trustee will retain the right to object to the compensation to be paid to Investment Banker pursuant to the Engagement Agreement based on the reasonableness standard provided for in Code §330, provided that reasonableness for this purpose shall include, among other things, an evaluation by comparing the fees payable to Investment Banker in this case to the fees paid to other investment banking firms for comparable services in other Chapter

WA 7763426.1

11 cases and out-of-court restructurings, and will not be evaluated primarily on the basis of time expended or the length of this Chapter 11 case.

33.    As set forth above, notwithstanding approval of the Engagement Agreement under Code § 328(a), Investment Banker intend to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court and consistent with the fee structure set forth in the Engagement Agreement.

Debtor respectfully requests that this Court enter an order under Code §§ 327(a) and 328(a) and Bankruptcy Rule 2014 approving the retention and employment of Investment Banker pursuant to the terms of the Engagement Agreement, and grant such other and further relief as this Court deems just and proper.

Date:   February 7, 2016

**SPENCER FANE LLP**

By: /s/ Lisa A. Epps
Scott J. Goldstein          MO Bar No. 28698
Lisa A. Epps               MO Bar No. 48544
Eric L. Johnson            MO Bar No. 53131
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Office: 816-474-8100
Facsimile: 816-474-3216
sgoldstein@spencerfane.com
lepps@spencerfane.com
ejohnson@spencerfane.com

PROPOSED COUNSEL FOR DEBTOR

WA 7763426.1

## EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **MID-STATES SUPPLY COMPANY, INC.,** | **Case No. 16-_____ (___)** |
| **Debtor.** | |

## DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF DEBTOR'S APPLICATION FOR ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF SSG ADVISORS, LLC PURSUANT TO 11 U.S.C. § 327(a)

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), J. Scott Victor, declares and says:

1.    I am a Managing Director of SSG Advisors, LLC ("SSG") and am duly authorized to make this Declaration on behalf of SSG. I make this Declaration on behalf of SSG in support of *Debtor's Application for Order Authorizing Retention and Employment of SSG Advisors, LLC and Frontier Investment Banc Corporation Pursuant to 11 U.S.C. §327(a)* (the "Application").

2.    The facts set forth in this Declaration are personally known to me, and if called as a witness, I could and would testify thereto. Capitalized terms not otherwise defined herein have the meanings given to them in the Application.

## BACKGROUND

3.    SSG is an investment banking services firm that provides a broad range of corporate advisory services to its clients, including in connection with mergers, acquisitions and divestitures, capital raising, corporate restructuring, and related services.

WA 7763426.1

4.      SSG is a nationally known and ranked boutique investment banking firm with thirteen (13) restructuring professionals representing financially challenged companies all over the U.S., Europe, and Asia. Since 2001, SSG has represented over one hundred debtors in Chapter 11 proceedings throughout the country.

5.      In addition, SSG's investment-banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and buyers in chapter 11 proceedings, including, but not limited to, *In re SW Liquidation, LLC (f/k/a Saladworks, LLC)*, Case No. 15-10327 (LSS); *In re Seegrid Corp.*, Case No. 14-12391 (BLS); *In re PMGI Holdings Inc.*, Case No. 13-12404 (CSS); *In re MSD Performance, Inc.*, Case No. 13-12286 (PJW); and *In re Cylex Inc.*, Case No. 12-13259 (BLS).

## SERVICES TO BE PROVIDED

6.      On or about January 28, 2016, Debtor signed an engagement agreement (the "Engagement Agreement") with SSG and Frontier Investment Banc Corporation ("Frontier," and together with SSG, the "Investment Banker"), a true and correct copy of which is attached to the Application as Exhibit C.

7.      As set forth in the Engagement Agreement and the Application, SSG will provide services to Debtor in connection with a sale, restructuring, and financing.

## PROPOSED COMPENSATION

8.      Pursuant to the Engagement Agreement and subject to the Court's approval, Debtor proposes to pay Investment Banker as follows (the "Fee Structure"):

a.      Initial Fee. An initial fee of $30,000, due upon signing of the Engagement Agreement, which has already been paid.

b.      Monthly Fees. Monthly fees (the "Monthly Fees") of $25,000 per month.

WA 7763426.1

c.      Sale Fee. Upon the consummation of a Sale Transaction,[2] Investment

Banker shall be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via

wire transfer or certified check, at and as a condition of closing of such Sale, equal to the

greater of (i) $500,000 or (b) two and one-half percent (2.5%) of Total Consideration. If

the Sale Transaction takes the form of a liquidation of Debtor, the Sale Fee shall be

$250,000.

d.      Financing Fee. Upon the closing of a Financing Transaction, Investment

Banker shall be entitled to a fee (the "Financing Fee"), payable in cash, in federal funds

via wire transfer or certified check, at and as a condition of closing of such Financing

equal to the greater of (i) $500,000 or (ii) two and one-half percent (2.5%) of any Senior

Debt raised from any source plus six percent (6.0%) of any Tranche B, Traditional

Subordinated Debt or Equity raised regardless of whether Debtor chooses to draw down

the full amount of the Financing.

e.      Restructuring Fee. Upon the closing of a Restructuring Transaction,

Investment Banker shall be entitled to a fee ("Restructuring Fee"), payable in cash, in

federal funds via wire transfer or certified check, at and as a condition of closing such

Restructuring equal to $500,000.

f.      In addition to the foregoing Fees, whether or not a Transaction is

consummated, Investment Banker will be entitled to reimbursement for all of Investment

Banker's reasonable out-of-pocket expenses incurred in connection with the subject

matter of this engagement.

9.      SSG and Frontier's fee sharing is subject to a side letter agreement between SSG

and Frontier. SSG and Frontier have agreed to split the compensation as follows: (i) SSG will

---

[2] Capitalized terms not defined herein shall have the meaning as set forth in the Engagement Letter.

WA 7763426.1

receive sixty percent (60%) and Frontier will receive forty percent (40%) of the Monthly Fees and any Transaction Fee; and (ii) SSG will receive fifty percent (50%) and Frontier will receive fifty percent (50%) of the Initial Fee. Other than as disclosed herein, SSG and Frontier have agreed not to share with any person or firm the compensation to be paid for its services rendered in connection with this Chapter 11 case.

10.     The Engagement Agreement provides that Debtor agrees to indemnify, defend, and hold harmless SSG, Frontier and any affiliates, the respective partners, members, directors, officers, agents, and employees and each other person, if any, controlling SSG and Frontier (collectively, the "Indemnified Parties") from and against all losses, claims, damages, liabilities, or costs, as and when incurred, in any way related to SSG and Frontier acting for Debtor under the Engagement Agreement. Debtor will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto.

## DISINTERESTEDNESS

11.     Except as otherwise disclosed herein and in the Application, SSG does not have any connections with Debtor, creditors, or any other parties in interest, their respective attorneys and accountants, the United States Trustee or any other person employed in the Office of the United States Trustee.

12.     Insofar as I have been able to ascertain, SSG does not hold an interest materially adverse to Debtor or Debtor's estate in the matter upon which it is to be employed.

13.     I believe that SSG is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

4

14.     In preparing this Declaration, I or someone under my supervision and direction reviewed documents provided by Debtor to determine whether SSG has any relationship with the parties in this Chapter 11 case. To the extent such review indicated that SSG had or has a relationship with or connection to any interested party, such relationship or connection is disclosed below.

15.     Based on information known to date, SSG's connections with Debtor, creditors, other parties in interest, their respective attorneys and consultants, the United States Trustee or any person employed in the Office of the United States Trustee, are as follows:

      a.     <u>Creditors and parties in interest</u>. Some of Debtor's creditors may routinely appear as creditors in other Chapter 11 cases or be creditors of other businesses for which SSG has provided services. Consequently, SSG may have been involved in cases, been adverse to, or been involved in transactions with some of Debtor's creditors in other matters. For example, SSG was engaged by Ballard Spahr LLP to serve as an expert consultant to assist in Ballard Spahr LLP's representation of Wells Fargo Bank, N.A in matter wholly unrelated to Debtor. SSG also has current and past matters with Winter Harbor LLC.  I am not aware of any connection with any of these entities or individuals that would disqualify SSG from serving as Debtor's investment banker in this matter, and SSG does not currently and has never represented any creditor or party in interest in any matter adverse to Debtor.

      b.     <u>Attorneys, accountants and other professionals; Office of the United States Trustee</u>. SSG may have in the past worked closely with one or more attorneys, accountants and other professionals who may participate in this Chapter 11 case on behalf of Debtor, creditors, or other parties in interest. SSG may have worked closely in

WA 7763426.1

the past with the United States Trustee and persons employed by the Office of the United States Trustee in connection with other bankruptcy cases. I am not aware of any connection with any such person or entity which would disqualify SSG from serving as Debtor's investment banker in this matter.

c.    <u>Other potential parties in interest</u>. SSG has endeavored in good faith to determine connections it may have with the principal creditors and parties in interest in this case based on information provided to it by Debtor. Nevertheless, it is possible that SSG may have other connections unrelated to this Chapter 11 case with other persons or entities involved herein. However, SSG has not represented any creditor or party in interest in relation to Debtor, and SSG will not represent any person or entity other than Debtor in this case. SSG will supplement this Declaration if SSG becomes aware of any connection with any other party in interest that would require disclosure.

16.    The disclosures above are based upon all information reasonably available to me at the time of filing of the Application. I will supplement this Declaration as may be required by the Bankruptcy Code and Bankruptcy Rules of the Court if and when any other connection requiring disclosure becomes known.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 7, 2016


　　　　　　　　　　　　　　　　　　 /s/ J. Scott Victor
　　　　　　　　　　　　　　　　　　 J. Scott Victor, Managing Director
　　　　　　　　　　　　　　　　　　 SSG Advisors, LLC

WA 7763426.1

**EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| MID-STATES SUPPLY COMPANY, INC., | Case No. 16-_____ (___) |
| Debtor. | |

## DECLARATION OF PATRICK J. TRYSLA IN SUPPORT OF DEBTOR'S APPLICATION FOR ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF FRONTIER INVESTMENT BANC CORPORATION PURSUANT TO 11 U.S.C. § 327(a)

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Patrick J. Trysla, declares and says.

1.      I am the Chief Executive Officer of Frontier Investment Banc Corporation ("Frontier") and am duly authorized to make this Declaration on behalf of Frontier. I make this Declaration on behalf of Frontier in support of *Debtor's Application for Order Authorizing Retention and Employment of SSG Advisors, LLC and Frontier Investment Banc Corporation Pursuant to 11 U.S.C. § 327(a)* (the "Application").

2.      The facts set forth in this Declaration are personally known to me, and if called as a witness, I could and would testify thereto. Capitalized terms not otherwise defined herein have the meanings given to them in the Application.

## BACKGROUND

3.      Frontier is an investment banking services firm that provides a broad range of corporate advisory services to its clients, including in connection with mergers, acquisitions and divestitures, capital raising, corporate restructuring, and related services.

4.    Frontier is a leading boutique investment banking firm that is focused on providing services to middle market companies and their owners.

## SERVICES TO BE PROVIDED

5.    On or about January 28, 2016, Debtor signed an engagement agreement (the "Engagement Agreement") with Frontier and SSG Advisors, LLC ("SSG," and together with Frontier, the "Investment Banker"), a true and correct copy of which is attached to the Application as Exhibit C.

6.    As set forth in the Engagement Agreement and the Application, Frontier will provide services to Debtor in connection with a sale, restructuring, and financing.

## PROPOSED COMPENSATION

7.    Pursuant to the Engagement Agreement and subject to the Court's approval, Debtor proposes to pay Investment Banker as follows (the "Fee Structure"):

a.    Initial Fee. An initial fee of $30,000, due upon signing of the Engagement Agreement, which has already been paid.

b.    Monthly Fees. Monthly fees (the "Monthly Fees") of $25,000 per month.

c.    Sale Fee. Upon the consummation of a Sale Transaction,[3] Investment Banker shall be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale, equal to the greater of (i) $500,000 or (b) two and one-half percent (2.5%) of Total Consideration. If the Sale Transaction takes the form of a liquidation of Debtor, the Sale Fee shall be $250,000.

d.    Financing Fee. Upon the closing of a Financing Transaction, Investment Banker shall be entitled to a fee (the "Financing Fee"), payable in cash, in federal funds

---

[3] Capitalized terms not defined herein shall have the meaning as set forth in the Engagement Letter.

2

via wire transfer or certified check, at and as a condition of closing of such Financing equal to the greater of (i) $500,000 or (ii) two and one-half percent (2.5%) of any Senior Debt raised from any source plus six percent (6.0%) of any Tranche B, Traditional Subordinated Debt or Equity raised regardless of whether Debtor chooses to draw down the full amount of the Financing.

      e.    <u>Restructuring Fee</u>. Upon the closing of a Restructuring Transaction, Investment Banker shall be entitled to a fee ("Restructuring Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing such Restructuring equal to $500,000.

      f.    In addition to the foregoing Fees, whether or not a Transaction is consummated, Investment Banker will be entitled to reimbursement for all of Investment Banker's reasonable out-of-pocket expenses incurred in connection with the subject matter of this engagement.

8.    SSG and Frontier's fee sharing is subject to a side letter agreement between SSG and Frontier. SSG and Frontier have agreed to split the compensation as follows: (i) SSG will receive sixty percent (60%) and Frontier will receive forty percent (40%) of the Monthly Fees and any Transaction Fee; and (ii) SSG will receive fifty percent (50%) and Frontier will receive fifty percent (50%) of the Initial Fee. Other than as disclosed herein, SSG and Frontier have agreed not to share with any person or firm the compensation to be paid for its services rendered in connection with this Chapter 11 case.

9.    The Engagement Agreement provides that Debtor agrees to indemnify, defend, and hold harmless SSG, Frontier and any affiliates, the respective partners, members, directors, officers, agents, and employees and each other person, if any, controlling SSG and Frontier

3

(collectively, the "Indemnified Parties") from and against all losses, claims, damages, liabilities, or costs, as and when incurred, in any way related to SSG and Frontier acting for Debtor under the Engagement Agreement. Debtor will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto.

## DISINTERESTEDNESS

10.    Except as otherwise disclosed herein and in the Application, Frontier does not have any connections with Debtor, creditors, or any other parties in interest, their respective attorneys and accountants, the United States Trustee or any other person employed in the Office of the United States Trustee.

11.    In 2004, Frontier had been engaged by Debtor to market the Debtor for a potential sale. In 2011, Frontier had been engaged by Debtor on unrelated matters. Debtor has not made any payments to Frontier based on this previous engagement since 2011.

12.    Frontier also entered into an engagement letter with Debtor in October, 2015, but that engagement letter has been superseded by the Engagement Agreement.

13.    Insofar as I have been able to ascertain, Frontier does not hold an interest materially adverse to Debtor or Debtor's estate in the matter upon which it is to be employed.

14.    I believe that Frontier is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

15.    In preparing this Declaration, I or someone under my supervision and direction reviewed documents provided by Debtor to determine whether Frontier has any relationship with the parties in this Chapter 11 case. To the extent such review indicated that Frontier had or has a

4

relationship with or connection to any interested party, such relationship or connection is disclosed below.

16.   Based on information known to date, Frontier's connections with Debtor, creditors, other parties in interest, their respective attorneys and consultants, the United States Trustee or any person employed in the Office of the United States Trustee, are as follows:

a.   <u>Creditors and parties in interest</u>. Some of Debtor's creditors may routinely appear as creditors in other Chapter 11 cases or be creditors of other businesses for which Frontier has provided services. Consequently, Frontier may have been involved in cases, been adverse to, or been involved in transactions with some of Debtor's creditors in other matters. I am not aware of any connection with any of these entities or individuals that would disqualify Frontier from serving as Debtor's investment banker in this matter, and Frontier does not currently and has never represented any creditor or party in interest in any matter adverse to Debtor.

b.   <u>Attorneys, accountants and other professionals; Office of the United States Trustee</u>. Frontier may have in the past worked closely with one or more attorneys, accountants and other professionals who may participate in this Chapter 11 case on behalf of Debtor, creditors, or other parties in interest. Frontier may have worked closely in the past with the United States Trustee and persons employed by the Office of the United States Trustee in connection with other bankruptcy cases. I am not aware of any connection with any such person or entity which would disqualify Frontier from serving as Debtor's investment banker in this matter.

c.   <u>Other potential parties in interest</u>. Frontier has endeavored in good faith to determine connections it may have with the principal creditors and parties in interest in

this case based on information provided to it by Debtor. Nevertheless, it is possible that Frontier may have other connections unrelated to this Chapter 11 case with other persons or entities involved herein. However, Frontier has not represented any creditor or party in interest in relation to Debtor, and Frontier will not represent any person or entity other than Debtor in this case. Frontier will supplement this Declaration if Frontier becomes aware of any connection with any other party in interest that would require disclosure.

17.     The disclosures above are based upon all information reasonably available to me at the time of filing of the Application. I will supplement this Declaration as may be required by the Bankruptcy Code and Bankruptcy Rules of the Court if and when any other connection requiring disclosure becomes known.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  February 7, 2016

/s/ Patrick J. Trysla
Patrick J. Trysla, Chief Executive Officer
Frontier Investment Banc Corporation

**EXHIBIT C**



Frontier Investment
Banc Corp

January 27, 2016

Mr. Stuart Noyes
Chief Restructuring Officer
Mid-States Supply Company, Inc.
1716 Guinotte Avenue
Kansas City, MO 64210

Dear Mr. Noyes,

This agreement ("Engagement Agreement") will serve as the contract between Mid-States Supply Company, Inc. and affiliates ("Mid-States Supply" or the "Company") and SSG Advisors, LLC ("SSG") and Frontier Investment Banc Corporation ("Frontier") (collectively "Advisors") regarding the retention of Advisors as exclusive investment bankers to Mid-States Supply for the purposes outlined in this Engagement Agreement. Advisors' responsibilities hereunder involve providing investment banking services to the Company, on an exclusive basis, focusing on the sale of all or part of Mid-States Supply (the "Sale"), although it is possible that the Company would ask the Advisors to (i) review of private placement alternatives to Mid-States Supply, if any, including raising debt and/or equity capital (the "Financing"); and/or (ii) assist Mid-States Supply with the restructuring of its debt and equity obligations (the "Restructuring").

A.    **SSG's Role:**

   1.    Advisors role in connection with a Sale will include the following:

   •    Prepare an information memorandum describing the Company, its historical performance and prospects, including existing contracts, marketing and sales, labor force, and management and anticipated financial results of the Company;

   •    Assist the Company in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by the Company;

   •    Coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

   •    Assist the Company in coordinating site visits for interested buyers and work with the management team to develop appropriate presentations for such visits;

   •    Solicit competitive offers from potential buyers;

Five Tower Bridge, Suite 420  •  300 Barr Harbor Drive  •  West Conshohocken, PA  19428
Phone: (610) 940-1094  •  Fax: (610) 940-3875
www.ssgca.com

**EXHIBIT C**

January 27, 2016
Page 2

- Advise and assist the Company in structuring the Sale, as the term is hereafter defined, and negotiating the Sale agreements; and

- Otherwise assist the Company, its attorneys and accountants, as necessary, through closing on a best efforts basis.

- As necessary, testify in support of the Sale.

2. Advisors' role in connection with the Financing will include the following:

- Prepare an information memorandum describing Mid-States Supply, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management, and financial projections;

- Assist the Company in compiling a data room of any necessary and appropriate documents related to the Financing;

- Assist the Company in developing a list of suitable potential lenders and investors who will be contacted on a discreet and confidential basis after approval by the Company;

- Coordinate the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

- Assist the Company in coordinating site visits for interested lenders and investors and work with the management team to develop appropriate presentations for such visits;

- Solicit competitive offers from potential lenders and investors;

- Advise and assist the Company in structuring the Financing and negotiating the lending and/or investment agreements;

- Otherwise assist the Company and its other professionals, as necessary, through closing on a best efforts basis.

3. Advisors role in connection with the Restructuring will include the following:

- Negotiate and assist the Company and Company counsel in reviewing secured debt documents and meeting with lenders, lessors and/or critical creditors regarding long term extension agreements and other restructuring arrangements;

- Work with critical vendors to secure alternatives and credit; and

- Otherwise assist the Company, its other professionals, as necessary, through closing, on a best efforts basis.

### EXHIBIT C

January 27, 2016
Page 3

In performing the services described above, the Company will furnish or cause to be furnished to Advisors such information as Advisors reasonably believe appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). Mid-States Supply represents to Advisors that, to the actual knowledge of the Company's executive officers, all Information furnished by the Company or its agents will be complete and correct in all material respects, and that until the expiration of Advisors' engagement hereunder, Mid-States Supply will advise the Advisors promptly of the occurrence of any event or any other change known by such officers that results in the Information ceasing to be complete and correct in all material respects. The Company recognizes and confirms that Advisors: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility for accurateness or completeness of the Information and such other information; and (c) will not make an appraisal of any of the assets or liabilities of Mid-States Supply.

The Company agrees that Advisors shall be its exclusive investment banker in connection with any Transaction undertaken with respect to Mid-States Supply during the Engagement Term, as defined below, of this Engagement Agreement. The Company agrees that, during the Engagement Term, Advisors shall have the exclusive authority to initiate and conduct discussions and assist and advise the Company in its negotiations with all prospective lenders, purchasers and investors. In that regard, the Company agrees to identify to Advisors: (a) all prospective lenders, purchasers and investors who have been in contact with Mid-States Supply prior to the date hereof; and (b) all prospective lenders, purchasers and investors who come in contact with the Company during the Engagement Term.

Advisors will consult with and advise the Company with respect to the financial aspects of any proposed Transaction, including price, terms and conditions of a Transaction. Advisors will not, however, have any authority to bind the Company with respect to any proposed Transaction. Likewise, nothing contained herein shall require the Company to accept the terms of any proposal and the Company shall at all times have the right in his sole and absolute discretion to reject any proposed Transaction regardless of the terms proposed.

B.    **Advisors' Compensation**

As compensation for providing the foregoing services, Advisors shall receive the following:

1.    Initial Fee. An initial fee (the "Initial Fee") equal to $30,000, due upon signing this Engagement Agreement.

2.    Monthly Fees. Monthly fees (the "Monthly Fees") of $25,000 per month payable on the fifteenth (15th) of each month beginning February 15, 2016.

3.    Sale Fee. Upon the consummation of a Sale Transaction to any party, Advisors shall be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale, equal to the greater of (a) $500,000 or (b) two and one-half percent (2.5%) of Total Consideration (as such term is hereafter

EXHIBIT C

January 27, 2016
Page 4

defined); provided, however, if the Sale Transaction takes the form of a liquidation of the Company, the Sale Fee shall be $250,000.

4. <u>Financing Fee</u>.  Upon the closing of a Financing Transaction to any party, Advisors shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Financing equal to the greater of: (a) $500,000; or (b)(i) 2.50% of any Senior Debt (as such term is hereafter defined) raised from any financing source, plus (ii) 6.0% of any Tranche B, Traditional Subordinated Debt or Equity (as such term is hereafter defined) raised regardless of whether the Company chose to draw down the full amount of the Financing.

In the event that the Financing is provided by existing shareholders, then SSG will not be owed a Financing Fee.

5. <u>Restructuring Fee</u>.  Upon the closing of an Restructuring Transaction, Advisors shall be entitled to a fee ("Restructuring Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Restructuring equal to $500,000.

6. In addition to the foregoing Initial Fee, Monthly Fee and Transaction Fees noted above whether or not a Transaction is consummated, Advisors will be entitled to reimbursement for all of Advisors' reasonable out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement.

C. **Definitions**

For the purpose of this Engagement Agreement:

**Sale Transaction** means and includes any transaction involving the sale or transfer, directly or indirectly, of all or part of the assets, secured debt or equity of Mid-States Supply, other than the sale of inventory in the ordinary course of business.

**Total Consideration** shall mean the purchase price paid for the equity or assets, plus the assumption or payoff of indebtedness (including secured debt) and/or payables.

**Financing Transaction** means funds received by Mid-States Supply from any senior debt, secured subordinated debt, unsecured subordinated debt or non-control equity from any lender or investor, other than the Company's current secured lender.

**Senior Debt** means funds:  (a) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, in the form of revolving credit facilities, notes, term loans, lines of credit, offering lines, purchase and sale of accounts receivable facilities, or any other type of credit facility, for which the Company or any entity acquired, or controlled, by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, without any profit participation or yield enhancement as a return on the repayment of the funds received by the Company, or any entity

# EXHIBIT C

January 27, 2016
Page 5

acquired, or controlled by, or under common control with the Company; and (b) for which the lender has a claim to or lien on the assets of the Company, or any entity acquired, or controlled by, or under common control with the Company, superior or prior to the claim of the holders of any Tranche B or Traditional Subordinated Debt.

**Tranche B Loan** means: (a) funds (i) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, or for which the Company, or any entity acquired, or controlled by, or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate higher than that of Senior Debt, and (ii) for which the lender may have a claim to or lien on the assets of the Company, or any entity acquired, or controlled by, or under common control with the Company, junior to the claim of the holders of Senior Debt.

**Traditional Subordinated Debt** means: (a) funds (i) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, or for which the Company, or any entity acquired, or controlled by, or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate; and (ii) for which the lender does not have a claim to or lien on the assets of the Company, or any entity acquired, or controlled by, or under common control with the Company; or (b) funds (i) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate; and (ii) for which part of the overall return to the investor on these funds is anticipated to consist of a participation in the profits of the Company and/or some other type of income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise) which has the effect of raising the overall return on these funds to the investors above the level that could be realized solely due to the receipt of stated interest income.

**Equity** shall include, but not be limited to, common stock preferred stock, convertible stock, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets, or asset sale.

**Restructuring Transaction** means, and includes any restructuring of existing and prospective Company stakeholder claims, including but not limited to, the Company's secured lenders, unsecured claims and shareholder interests either through a Plan of Reorganization of a Section 363 Sale where management and/or existing shareholders retain an interest.

For purposes of computing any fees payable to Advisors hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal) for the five (5) trading days prior to the closing of the Sale Transaction; and (b) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company and Advisors. If such aggregate consideration may be increased by contingent payments such as an "earnout" or other monetary agreement in the transaction, the portion of Advisors' fee relating thereto shall be calculated and paid when and as such contingent payments or other monetary amounts are received.

# EXHIBIT C

January 27, 2016
Page 6

**Transaction** shall mean and include a Sale, Financing, and/or Restructuring, as determined above.

**Transaction Fee** shall mean and include a Sale Fee, Financing Fee, and/or Restructuring Fee.

D.    **Term of Engagement**

This Engagement Agreement shall remain in force (the "Engagement Term") for a period of four (4) months from the date of signing this Engagement Agreement and will continue thereafter unless terminated by either party upon thirty (30) days prior written notice to the other; provided, however, that either party may terminate this Engagement Agreement by written notice immediately upon the closing of a Transaction.  Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that:  (a) termination of the Engagement Agreement shall not affect Advisors' right to indemnification under the Indemnification paragraph below; (b) the Company shall remain obligated to pay Advisors any unpaid Monthly Fees and to reimburse Advisors for any expenses incurred through the date of the termination of the Engagement Agreement; and (c) except upon the termination of the Engagement Agreement by written notice immediately upon the closing of a Transaction (in which case this subsection (c) shall not apply), if a Transaction is consummated within twelve (12) months ("Trailer Term") of the termination of this Engagement Agreement, the Company shall remain obligated to pay a Sale Fee, Financing Fee, or Restructuring Fee, as calculated above. Sections B, D, E, F and G (entitled Compensation, Term of Engagement, Indemnification, Miscellaneous, and Scope of Duties, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely.

E.    **Indemnification**

The Company hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof.

F.    **Miscellaneous**

No fee payable to any other financial advisor or finder by Mid-States Supply in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to Advisors hereunder. This Engagement Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto, including, without limitation, the letter agreement between the Company and Frontier Investment Banc Corporation dated October 18, 2015. This Engagement Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties.  The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the Indemnified Parties and their respective successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns.

EXHIBIT C

January 27, 2016
Page 7

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

Any amendment, modification or other changes to this Engagement Agreement must be in writing and signed by both parties to be enforceable.

G.   **Scope of Duties**

The Company hereby acknowledges and agrees that: (a) it has retained Advisors for the purposes set forth in this Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature; and (b) Advisors have not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company as a result thereof. Both the Company and Advisors disclaim any intention to impose fiduciary duties or obligations on the other by virtue of the engagement contemplated by this Engagement Agreement and no other person or entity shall have any rights or obligations hereunder except as expressly provided herein.

H.   **Bankruptcy Court Proceedings**

In the event the Company files one or more Chapter 11 Bankruptcy proceedings, either voluntary or involuntary, during the Engagement Term, the Company shall use its best commercially reasonable efforts to have Advisors employed upon the same or substantially similar terms and shall have this Engagement Agreement and Advisors' retention as the Company's exclusive investment banker approved by a Court of competent jurisdiction.

I.   **Other Matters**

The Company agrees that Advisors have the right, following the Sale, Financing, or Restructuring closing, to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), Advisors are required to obtain, verify and record information that identifies its clients, which information may include the name and address of Mid-States Supply and its senior management team as well as other information that will allow Advisors to properly identify its clients. Additionally, Advisors maintain important disclosures on the web site www.ssgca.com. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting Advisors directly at (610) 940-1094.

J.   **Securities Platform**

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under) are offered through SSG Capital Advisors, LLC. ("SCA"), an affiliated

## EXHIBIT C

January 27, 2016
Page 8

Pennsylvania corporation and registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor

Protection Corporation ("SIPC"). Principals of SSG are registered representatives of SCA. Therefore, SCA is included collectively as "SSG" with all the rights and obligations thereto under the terms of this Engagement Agreement.

To the extent a Transaction Fee is payable to SSG in connection with Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under), such Transaction Fee shall be specifically paid to SCA. Under no circumstance will Company be obligated to pay a fee in an aggregate amount in excess of the amount provided in this Engagement Agreement. Payment of the fee to SCA shall constitute and be deemed payment of the fee in this Engagement Agreement.

K.   **Confidentiality**

In connection with this Engagement Agreement, the term "Confidential Information" means all information related to the Company, which is not generally known by persons other than the Company (including its employees), and which is proprietary to the Company or the disclosure of which would be detrimental to the Company, including, without limitation (i) the Information, (ii) work product resulting from or relating to the services provided by Advisors, (iii) the Company's internal personnel, financial and marketing information, and (iv) the Company's strategic, operational, marketing, advertising and other business plans and forecasts. Advisors agree that, unless the Company has consented, or unless required by law, a court or agency of the government, Advisors will not reveal or disclose any such Confidential Information to any third party, except to utilize such Confidential Information in a manner consistent with customary industry practices in connection with the provision of the services provided by Advisors. Following the termination of this Agreement and this engagement, all such non-public Confidential Information in Advisors' possession will be promptly returned to the Company.

Neither the previous paragraph nor any restriction, non-disclosure or use limitation or other obligation contained in this Agreement shall apply to any information, data or item of any kind that is: (i) in the public domain, through no action of Advisors; (ii) disclosed to Advisors by any person or entity not known by Advisors after reasonable inquiry to be under an obligation of confidentiality to the Company; or (iii) independently developed or derived by Advisors.

EXHIBIT C

January 27, 2016
Page 9


Please indicate your acceptance of the foregoing by executing and returning the enclosed
copy of this letter.


**SSG ADVISORS, LLC**


By: _____          _____
J. Scott Victor                                        Mark E. Chesen
Managing Director                                Managing Director


**FRONTIER INVESTMENT BANC CORPORATION**


By: _____
Name: Patrick J. Trysla
Title: Chief Executive Officer

ACCEPTED:

**MID-STATES SUPPLY, INC.**


By: _____          _1/28/2016_____
Stuart Noyes                                        Date
Chief Restructuring Officer

### EXHIBIT C

January 27, 2016
Page 10

### ATTACHMENT A
### INDEMNIFICATION PROVISIONS

The Company agrees to indemnify, defend and hold harmless SSG and SCA and Frontier, the respective partners, members, directors, officers, agents and employees of SSG and Frontier and its affiliates and each other person, if any, controlling SSG and Frontier or its affiliates (the foregoing being referred to herein individually as an "Indemnified Party" and collectively as the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party, directly or indirectly, in any way related to Advisors' acting for the Company under the Engagement Agreement of which this Attachment A forms a part, including, without limitation, in connection with: (a) any act or omission by Advisors related to its engagement as financial advisor under the Engagement Agreement; or (b) Advisors' acceptance, or its performance or non-performance, of its obligations under said Engagement Agreement. The Company will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto; provided, however, that the Company shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found in a final judgment by a court of competent jurisdiction, not subject to further appeal, to have resulted primarily from Advisors' gross negligence or willful misconduct in the performance of its duties under said Engagement Agreement. The Company agrees that reliance by Advisors on any publicly-available information, the information supplied by the Company to Advisors in connection with said Engagement Agreement or any directions furnished by the Company shall not constitute negligence, bad faith or willful misconduct by Advisors.

In order to provide for just and equitable contribution, if a claim for indemnification is made pursuant to said Engagement Agreement but it is found in a final judgment by a court of competent jurisdiction, not subject to further appeal, that such indemnification may not be enforced in such case, the Indemnified Parties, on the one hand, and the Company, on the other hand, shall each contribute to the amount paid or payable as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties, on the one hand, and the Company, on the other hand, and the relative benefits to the Indemnified Parties, on the one hand, and the Company, on the other hand, arising out of the particular matter or transaction which gave rise to such loss, claim, damage, liability or costs, and all other relevant equitable considerations shall also be taken into account. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, Advisors shall not be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by Advisors hereunder.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.