IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| MID-STATES SUPPLY COMPANY, INC., | Case No. 16-_____ (___) |
| Debtor. | Section ____ |

### MOTION FOR ENTRY OF ORDER PURSUANT TO
### 11 U.S.C. §§ 105(a) AND 363(b) AUTHORIZING AND APPROVING
### DEBTOR'S EMPLOYMENT OF TARSUS CFO SERVICES, LLC

Debtor Mid-States Supply Company, Inc. ("Debtor"), files its Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Employment of Tarsus CFO Services, LLC (the "Motion").   In support of the Motion, Debtor relies upon and incorporates by reference the Declaration of Paul L. Burns (the "Burns Declaration") attached as **Exhibit A**, and respectfully states as follows:[1]

### Procedural Background

1.      On February 7, 2016 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri.

2.      Debtor remains in possession of its assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3.      An Official Committee of Unsecured Creditors has not yet been appointed.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A).

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Engagement Letter (defined herein).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

### Debtor's Background

7.      Debtor supplies pipes, valves and fittings to ethanol, pipeline and power industries in the United States. It also offers hoses, tools, compounds, gauges and thermometers. In addition, Debtor provides compressed air, steam, process control and services, along with IT solutions, such as project and customer websites, PocketPC software, customer inventory management, integrated supply, order tracking system and communication options. Debtor's products are sold to a myriad of industries, including large industrial plant operations, food production, oil and gas pipeline transportation, mechanical construction and other large industrial players.

8.      Founded and headquartered in Kansas City, Missouri since 1947, Debtor, a family-owned company, operates out of 23 locations, certain of which branches operate under the "Midco" fictitious brand name, in the following states—Alabama, Colorado, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, Utah, West Virginia and Wyoming.  Debtor currently has approximately 228 employees.

9.      On September 1, 2011, Debtor entered into Credit and Security Agreement, as amended from time to time (the "Credit Agreement") with Wells Fargo Bank, National Association ("Wells Fargo"), under which it borrowed $45 million, which line grew with its growth to approximately $60 million.  Using the expanded availability from Wells Fargo, Debtor roughly doubled its sales and EBITDA from fiscal 2011 through today.  By 2015, a confluence of factors, including the demand for inventory with over 32,000 SKU's, no concentration in the customer base (meaning a broad demand for stocked product) and a rapid decline in the oil and gas sector, kept Debtor's inventory and payables at unsustainably high levels. These factors led

WA 7763428.3

Debtor's management to implement plans to right-size the business with respect to inventory, payables, rationalizing the customer base, operating expenses and tightly managing cash flow.

10.    As a result of various defaults under the Credit Agreement, on August 28, 2015, Debtor entered into its first forbearance agreement with Wells Fargo.  In connection with this forbearance agreement and Debtor's restructuring efforts, on August 25, 2015, Debtor engaged Stuart Noyes to act as its chief restructuring officer ("CRO")—Winter Harbor LLC ("Winter Harbor") had been providing financial advisory services to Debtor since May 2015.

11.    Since the first forbearance agreement with Wells Fargo, Debtor has entered into two other forbearance agreements with Wells Fargo, the most recent of which, dated December 28, 2015, expires by its terms on February 29, 2016 and contains numerous benchmarks (the "Benchmarks").  While Debtor and its CRO have been working tirelessly to restructure its business and meet the Benchmarks, Debtor has determined in its business judgment that filing the captioned bankruptcy case is in the best interest of its creditors.

## Relief Requested

12.    By this Motion, Debtor seeks entry of an Order under Code §§105(a) and 363(b) authorizing and approving the employment of Tarsus CFO Services, LLC ("Tarsus") to provide chief financial officer services in this Chapter 11 case, effective as of the Petition Date, pursuant to the Engagement Letter, attached as **Exhibit B**.

## Tarsus' Qualifications

13.    Tarsus' professionals have a wealth of experience in providing cost-effective, financial expertise to companies.  On May 13, 2011, on the basis of the qualifications of Tarsus' professionals, Debtor entered into an agreement to retain Tarsus to provide chief financial officer, consulting and other professional services (together with any amendments, the "Engagement Letter").  Tarsus has developed a significant amount of institutional knowledge

WA 7763428.3

regarding Debtor's operations, finances and systems.   On the basis of this experience and knowledge, Tarsus is uniquely positioned to provide the services described in the Engagement Letter and herein.

14.     If Debtor is not permitted to retain Tarsus, Debtor would be forced to retain a new chief financial officer not familiar with Debtor's financial affairs, business operations and restructuring efforts.  The time expended in locating and retaining a chief financial officer, and in bringing them up to speed, likely would delay and hinder Debtor's restructuring efforts.

### Scope of Services

15.     As set forth in the Engagement Letter, Tarsus has been providing and will continue to provide the following services, among others:

      a.     Duties of a chief financial officer, including assisting with the preparation of financial statements;

      b.     Accounting and reporting services, including collateral reporting and reconciliations;

      c.     Duties of a controller, including vendor cash flow management;  and

      d.     provide such other services as requested or directed by Debtor.

### Tarsus' Disinterestedness

16.     Although Debtor submits that the retention of Tarsus is not governed by Code § 327, Debtor attaches the Burns Declaration, which discloses, among other things, any relationship that Tarsus has with Debtor, its significant creditors or other significant parties in interest known to Tarsus. If any new material facts or relationships are discovered or arise, Tarsus will provide the Court with a supplemental declaration.

17.     Tarsus has informed Debtor that, except as may be set forth in the Declaration, it (i) has no connection with Debtor, its creditors or other parties-in-interest in this Chapter 11 case;

WA 7763428.3

(ii) does not hold any interest adverse to Debtor's estate and (iii) believes it is a "disinterested person" as defined in Code § 101(14).

18.      Tarsus remits fees to Synergy Staffing Services, LLC for sourcing controller-level and lower-level professional resources. To provide the appropriate expertise and capabilities to Debtor, Tarsus may remit such fees to Synergy Staffing Services, LLC during this Chapter 11 case. Other than disclosed herein, Tarsus has agreed not to share with any person or firm the compensation to be paid for its services rendered in connection with this Chapter 11 case.

## Terms of Retention

19.      Pursuant to the terms set forth in the Engagement Letter, Debtor will compensate Tarsus as follows:[2]

a.      Compensation: Debtor has agreed to compensate Tarsus at its standard hourly rates during the pendency of the Chapter 11 case. The billing rates for professionals who may be assigned to this engagement are as follows:

| Lead Professional | $160 to $175 per hour |
| Secondary Professional | $85 to $115 per hour |

b.      Reimbursement of Expenses: Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

c.      Indemnification: Debtor will indemnify Tarsus, its principals, employees and affiliates in the event of certain losses, subject to the following limitations and notwithstanding the provisions of the Engagement Letters:

---

[2]      To the extent there is any inconsistency in connection with the summary of the principal terms of the Engagement Letter set forth in this Motion and the principal terms as set forth in the Engagement Letter, the terms of the Engagement Letter shall control.

WA 7763428.3

    i.        Debtor is permitted to indemnify Tarsus on the same terms as provided to (and not on terms more favorable than) Debtor's officers and directors under the corporate bylaws and applicable state law.

    ii.       During the course of this Chapter 11 case, all provisions in the Engagement Letter or elsewhere that attempt to limit Tarsus's liability to the amount of its fees (or a multiple thereof) shall be of no force or effect.

20.      Because Tarsus is not being retained as a professional under Code § 327, it will not be submitting fee applications pursuant to Code §§ 330 and 331. Instead, Debtor intends that the fees and expenses incurred by Tarsus in completion of its services under the Engagement Letter be treated as administrative expenses of Debtor's Chapter 11 estate and paid by Debtor in the ordinary course of business. Tarsus will be entitled to be paid in full immediately upon invoicing Debtor, but will file with the Court and provide notice as required by any Order governing compensation procedures (the "Compensation Procedures Order"), reports of compensation and expenses on a quarterly basis. Such reports shall include the names and functions of the individuals assigned to this matter, and shall include detailed time entries describing the task(s) performed—recorded in one-half hour increments—and organized by project category. Such reports will also provide a time period for objections as to compensation previously paid, and all compensation previously paid during such quarter will be subject to review by the Court in the event an objection is filed. Additionally, Tarsus shall file with the Court and provide notice pursuant to the Compensation Procedures Order, monthly reports of staffing on the engagement for the previous month. Debtor believes that Tarsus's fees and compensation as set forth herein are reasonable and justified under the circumstances.

WA 7763428.3

## Fees and Expenses Paid Under the Engagement Letter

21.     Within the 90 days preceding the Petition Date, Tarsus received payments from Debtor in the aggregate amount of $240,804.71.

## Indemnification

22.     Tarsus on the one hand and Debtor on the other negotiated the terms and conditions of the Engagement Letter, including the provisions regarding indemnification of Tarsus, at arms' length and in good faith. Debtor and Tarsus believe that the indemnification language set forth in the Engagement Letter is customary and reasonable for similar engagements in Chapter 11 cases and reflects the qualifications and limitations on indemnification provisions that are customary.

## Basis for Relief Requested

23.     Debtor requests authority to retain Tarsus under the terms of the Engagement Letter pursuant to Code § 363(b), which provides in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts interpreting Code § 363(b) have held that transactions should be approved pursuant to this provision when, as here, they are supported by management's sound business judgment. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bankr. v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" test for section 363(b)).

24.     Courts recognize the applicability of Code § 363(b) to the use of estate property to compensate individuals employed outside the ordinary course of business. *See In re First Int'l Services Corp.*, 25 B.R. 66, 69 (Bankr. D. Conn. 1982).  Indeed, courts have relied upon Code §

WA 7763428.3

363(b) as the basis upon which to employ and compensate firms that provide professionals to serve as officers or other management-level personnel employed by the debtor. *See, e.g., In re Bearingpoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Feb. 18, 2009) (authorizing employment of chief financial officer); *In re Spansion Inc.*, Case No. 09-10690 (KJC) (Bankr. D. Del. Apr. 13, 2009) (authorizing employment of officers to provide management and restructuring services); *In re Verasun Energy Corp.*, Case No. 08-12606 (BLS) (Dec. 8, 2008) (authorizing employment of crises manager and designating chief restructuring officer and senior vice president); *In re DBSI, Inc.*, Case No. 08-12687 (PJW) (Bankr. D. Del. Dec. 17, 2008) (authorizing employment of chief restructuring officer); *In re WorldSpace, Inc.*, Case No. 08-12412 (KJC) (Bankr. D. Del. Nov. 10, 2008) (authorizing chief restructuring officer); *In re Dan River Holdings, LLC*, Case No. 08-10726 (BLS) (Bankr. D. Del. May 19, 2008) (authorizing chief restructuring officer and additional personnel); *In re Hancock Fabrics, Inc*., Case No. 07-10353 (BLS) (Bankr. D. Del. April 26, 2007) (authorizing interim officers); *In re Interstate Bakeries Corp.*, Case No. 04-45814 (JWV) (Bankr. W.D. Mo. October 25, 2004) (authorizing appointment of restructuring managers as officers of debtor).

25.     Debtor has determined, in the exercise of its business judgment, that the fee structure set forth in the Engagement Letter appropriately reflects the nature of the services to be provided by Tarsus, contains reasonable terms and conditions of employment, and should be approved under Code § 363.

26.     Debtor has engaged Tarsus to complete crucial time-sensitive and work-intensive projects.  Tarsus is providing services currently, and the continued assistance of Tarsus is crucial to the success of Debtor's chapter 11 case.

WA 7763428.3

### Waiver of Bankruptcy Rule 6004(h)

27.     Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

WHEREFORE, Debtor respectfully requests the Court enter an order authorizing Debtor to employ Tarsus and grant such further relief as is just and proper.

February 7, 2016

**SPENCER FANE LLP**

By: /s/ Lisa A. Epps
Scott J. Goldstein          MO Bar No. 28698
Lisa A. Epps                MO Bar No. 48544
Eric L. Johnson             MO Bar No. 53131
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Office: 816-474-8100
Facsimile: 816-474-3216
sgoldstein@spencerfane.com
lepps@spencerfane.com
ejohnson@spencerfane.com

PROPOSED COUNEL FOR DEBTOR

WA 7763428.3

**Exhibit A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | Chapter 11 |
| MID-STATES SUPPLY COMPANY, INC., | Case No. 16-_____ (___) |
| Debtor. | |

**DECLARATION OF PAUL L. BURNS IN SUPPORT OF MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AUTHORIZING AND APPROVING DEBTOR'S EMPLOYMENT OF TARSUS CFO SERVICES, LLC**

I, Paul L. Burns, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, to the best of my knowledge and belief, and after reasonable inquiry, as follows:

1.     I am a Member and Partner of Tarsus CFO Services, LLC ("Tarsus"), a financial advisory services firm that maintains offices at 4900 Main Street, Suite 750, Kansas City, Missouri, 64112, and I make this declaration on behalf of Tarsus (the "Declaration").  I submit this Declaration in support of the Motion.[1]

2.     Unless otherwise stated in this Declaration, I have personal knowledge of the matters set forth herein.

3.     To the extent any information disclosed herein requires amendment or modification upon Tarsus' completion of further review or as additional party in interest information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended or modified information.

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Motion.

4.      Tarsus provides chief financial officer services, as well as other accounting, finance and strategic services.  The professionals and employees at Tarsus have considerable experience advising clients and providing financial advisory services.

5.      On May 13, 2011, Debtor entered into the Engagement Letter, which has been amended from time to time. Tarsus has provided financial services, including services of a chief financial officer, since that time. Neither I nor Tarsus, nor any professional associated with Tarsus, has been engaged by any entity other than the Debtor in connection with this Chapter 11 case.

6.      Tarsus is not a creditor of Debtor. In the 90 days prior to the Petition Date, Tarsus received payment from Debtor in the aggregate amount of $240,804.71.

7.      To the best of my knowledge and belief, insofar as I have been able to ascertain, none of the principals or employees of Tarsus working on or connected to this engagement on Debtor's behalf have had, or will have in the future, direct contact concerning this Chapter 11 case with the potential parties in interest herein, the United States Trustee or anyone employed in the Office of the United States Trustee, other than in connection with this engagement for Debtor.

8.      Tarsus has researched its client database and performed reasonable due diligence to determine whether it had any relationships with the entities that were listed on **Schedule 1**, attached and incorporated herein, provided to Tarsus by Debtor in this Chapter 11 case (collectively, the "Interested Parties"), which included the following:

a.      Debtor;

b.      Debtor's principals;

c.      Debtor's secured lenders with security interests in the Debtor's cash; and

      d.      Debtor's 20 largest unsecured creditors, as identified in its Chapter 11 petition.

9.      From the internal search, Tarsus has discovered no connections with the Interested Parties.

10.      Tarsus provides financial advisory services to a number of companies. As a result, Tarsus has and may in the future represent certain Interested Parties. None of those engagements or relationships relate to this Chapter 11 case.

11.      To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, other than in connection with these cases, neither I, nor Tarsus, nor any of its principals, employees, agents or affiliates, have any connection with the Debtor, its creditors, the United States Trustee, or any other party with an actual or potential interest in this Chapter 11 case, or their respective attorneys or accountants, except as set forth below:

      a.      From time to time, Tarsus has provided services, and likely will continue to provide services, to certain creditors of Debtor and various other parties adverse to Debtor in matters unrelated to Debtor's Chapter 11 case. As described above, however, Tarsus has undertaken a detailed search to determine and to disclose whether it is providing or has provided services to any significant creditors, equity security holders, insiders or other parties in interest in such unrelated matters.

      b.      Tarsus personnel may have business associations with certain creditors of Debtor unrelated to Debtor's Chapter 11 case. In addition, in the ordinary course of its business, Tarsus may engage counsel or other professionals in unrelated matters who now

represent, or who may in the future represent, creditors or other interested parties in this case.

12.     Other than as disclosed herein, Tarsus has no relationship with Debtor of which I am aware after due inquiry.

13.     To the best of my knowledge, Tarsus has not been retained to assist any entity or person other than Debtor on matters relating to, or in connection with, this Chapter 11 case. If the Court approves the proposed employment of Tarsus by Debtor, Tarsus will not accept any engagement or perform any service for any entity or person other than Debtor in this Chapter 11 case. Tarsus will, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of Debtor or parties in interest in this Chapter 11 case; provided, however, that such services do not relate to, or have any direct connection with, this Chapter 11 case.

14.     To the best of my knowledge, information and belief, Tarsus does not have or represent any interest materially adverse to the interests of Debtor, or of any class of creditors or equity security holders of Debtor, by reason of any direct or indirect relationship to, connection with or interest in Debtor or any investment banker for any securities of Debtor, or for any other reason except as noted above.

15.     Despite efforts to identify and disclose Tarsus' connections with parties in interest in these cases, because Debtor operates a large enterprise with hundreds of creditors and other relationships, Tarsus is unable to state with certainty that every client relationship or other connection has been disclosed.  In this regard, if Tarsus discovers additional information that requires disclosure, Tarsus will file a supplemental disclosure with the Court.

16.     Tarsus submits that it holds no interest adverse to Debtor as to the matters for which it has been employed by Debtor.  Certain individuals affiliated with Tarsus may provide financial services to Debtor on a part-time basis, while others will be engaged full-time.  To the extent such individuals are employed on a part-time basis, Tarsus submits that there are no simultaneous or prospective engagements existing which would constitute a conflict or adverse interest as to the matters for which it has been employed by Debtor.

17.     Tarsus reserves the right to supplement this Declaration in the event that Tarsus discovers any facts bearing on matters described in this Declaration regarding Tarsus' employment by the Debtor.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of February, 2016.

/s/ Paul L. Burns
Paul L. Burns
Member & Partner - Tarsus CFO Services, LLC

## Schedule 1

1.  **Debtor**

2.  **Debtor Affiliates**

3.  **Secured Lenders**

4.  **Creditors Holding Largest Unsecured Claims**

5.  **Other Creditors And Interested Parties**

6.  **Common Stockholders**

7.  **Parties With Potential or Former Preferred Stock, Warrant and/or Option Rights**

8.  **Employees, Current And Former**

9.  **Parties Potentially Holding Certain Property Of The Debtor**

10. **Missouri Bankruptcy Judges**

11. **United States Trustee's Office**

4520 Main Street, 16" Floor                                Phone: (816) 360-1835
Kansas City. MO 64111                                        Fax: (816) 360-1845

## MASTER ENGAGEMENT AGREEMENT

May 13, 2011


Mr Benjamin Hurst
CEO
Mid-States Supply Company, Inc.
1716 Guinotte Ave
Kansas City, MO 64120


Dear Ben:

Tarsus CFO Services, LLC ("Tarsus") appreciates the opportunity to assist Mid-States Supply Company, Inc. ("Mid-States" or the "Company") by providing chief financial officer, consulting and other professional services from time to time. This agreement details the terms and conditions of our engagement by you. summarizes the scope of the services to be performed and outlines the responsibilities of Tarsus and Mid-States (the "Master Engagement Agreement").

### *Scope of Services and Responsibilities*

### Engagement and Exclusivity of Findings

Tarsus is being engaged hereby to conduct and perform specific financial and operational professional services on behalf of and as directed by Mid-States. The specific actions and the scope of the services provided by Tarsus will be determined on an assignment-by-assignment basis by and between Tarsus and Mid-States and, generally, will be documented in Exhibits attached hereto. Tarsus will perform the services agreed upon between Tarsus and the Company from time to time and render our analyses, findings, work product and opinions (the "Findings") in either written or oral form. as directed by Mid-States, for the exclusive use and benefit of the Company.

EXHIBIT B

Confidential

Tarsus CFO Services. LLC
May 13. 201'

## Access

Tarsus will need access to certain members of the Mid-States' team as appropriate for each particular assignment. In addition, tasks, responses and decisions to be completed or made by individuals at Mid-States must be done in an accurate and timely fashion in order for Tarsus to carry out projects successfully and on schedule. In turn, Tarsus will make all efforts necessary to serve as the project catalyst, ensuring that communication is open and that tasks stay on course.

## *Engagement Period*

The Engagement Period covered by this agreement will commence as of May 10, 2011 and will remain in effect until cancelled by either party with a thirty (30) day written notice.

## *Fees and Related Items*

The fees and payment terms for our services will be specified in the Exhibits attached hereto.

Any travel and out-of-pocket expenses incurred by Tarsus will be reimbursed by Mid-States. Tarsus will invoice the Company within 15 days of such expenses or upon completion of our services and they shall be due immediately upon receipt. It is the policy of Tarsus to take commercially reasonable efforts to source all out-of-pocket goods and services from reasonable cost providers.

## *Personnel*

Mid-States acknowledges that Tarsus incurs significant expense in sourcing, recruiting, contracting, hiring and training its professionals. Further, the Company acknowledges that Tarsus professionals are a vital and valuable resource of Tarsus. Accordingly, Mid-States agrees that during the term of this Master Engagement Agreement and for a period equal to eighteen (18) months after the expiration or termination of this Master Engagement Agreement, the Company and its affiliates shall not directly or indirectly solicit, recruit, or hire any professional (a) employed by or acting as an independent contractor for Tarsus, and (b) who provided services to the Company pursuant to this Master Engagement Agreement, without the express written permission of Tarsus; provided, however, that this restriction shall not apply to any professionals with whom Mid-States has had discussions prior to the date of this Master Engagement Agreement. When Tarsus agrees in writing to allow Mid-States to recruit a Tarsus professional and such professional accepts to work for or provide services to the Company outside of this Master Engagement Agreement, Mid-States agrees to pay Tarsus a one time fee equal to the lesser of 25% of the first year salary or $40,000. If this provision is violated in any way (e.g., Mid-States hires a Tarsus professional without the express written permission of Tarsus), the Company agrees to pay liquidated damages to Tarsus equal to $75,000.

## Confidential Information

Tarsus acknowledges that, in and as a result of this Master Engagement Agreement, Tarsus may have access to, make use of, acquire and/or add to Company's confidential information including without limitation such matters as Company's business practices, technology, systems, procedures, manuals, confidential reports and lists of customers or clients, or other similar data, as well as the nature and type of know-how, financial information, strategic information, goals, plans, and pricing and/or other services offered by the Company (collectively "Confidential Information").

Tarsus acknowledges that the Confidential Information is the sole and exclusive property of Company, has value to Company due to the fact that it is not generally known to the public and that Company has taken reasonable precautions to keep this information confidential. As a material inducement to Company to enter into this Agreement and to pay to Tarsus the fees referred to herein and specifically in the Exhibits, Tarsus covenants and agrees that they shall not, at any time during or following the cessation of this Master Engagement Agreement, directly or indirectly, use, divulge or disclose, for any purpose whatsoever other than to benefit Company, any Confidential Information. Tarsus further agrees that during and following the cessation of this Master Engagement Agreement, Tarsus shall have an affirmative obligation to take all reasonable actions to assist Company in keeping the Confidential Information secret.

## Inability to Contract for Company

Notwithstanding anything herein contained to the contrary, Tarsus shall not have the right to make any contracts or commitments for or on behalf of Company without first obtaining the written consent of Company.

## Indemnification by Mid-States

Mid-States agrees to indemnify, defend and hold harmless Tarsus and its affiliated entities (including Tarsus Holdings, LLC), principals, members, employees, contractors and representatives (each, an "Indemnitee") from and against any and all expenses (including attorneys' fees), costs, judgments, fines, and amounts paid by Indemnitee in connection with the defense or settlement of any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative to which Indemnitee is, was, or at any time becomes a party relating to or arising out of the services provided under this Master Engagement Agreement.

Promptly after receipt by Indemnitee of notice of the commencement of any action, suit or proceeding, Indemnitee will, if a claim in respect thereof is to be made against Mid-States hereunder, notify Mid-States of the commencement thereof. With respect to any such action, suit or proceeding as to which Indemnitee notifies Mid-States of the commencement thereof:

(a)       Mid-States will be entitled to participate therein at its own expense;

(b)       Except as otherwise provided below, to the extent that it may wish, Mid-States will be entitled to assume the defense thereof, with counsel reasonably satisfactory to Indemnitee. After notice from Mid-States to Indemnitee of its election so to assume the defense thereof, Mid-States will not be liable to Indemnitee under this Master Engagement Agreement for any legal or other expenses subsequently incurred by Indemnitee in connection with the defense thereof other than as otherwise provided below. Indemnitee shall have the right to employ his/her own counsel in such action, suit or proceeding but the fees and expenses of such counsel incurred after notice from Mid-States of its assumption of the defense thereof shall be at the expense of Indemnitee unless (i) the employment of counsel by Indemnitee has been authorized by Mid-States, (ii) Indemnitee shall have reasonably concluded that there may be a conflict of interest between Mid-States and Indemnitee in the conduct of the defense of such action, or (iii) Mid-States shall not in fact have employed counsel to assume the defense of such action, in each of which cases the fees and expenses of counsel shall be at the expense of Mid-States; and

(c)       Mid-States shall not be liable to indemnify Indemnitee under this Master Engagement Agreement for any amounts paid in settlement of any action or claim effected without Mid-States prior written consent. Mid-States shall not settle any action or claim in any manner which would impose any penalty or limitation on Indemnitee without Indemnitee's written consent. Neither Mid-States nor Indemnitee will unreasonably withhold their consent to any proposed settlement.

Mid-States will not hold Indemnitee harmless or provide indemnification pursuant to this Master Engagement Agreement on account of Indemnitee's conduct which amounts to gross negligence or willful misconduct.

Any claim by or on behalf of either party arising out of the Master Engagement Agreement shall be deemed waived if a claim is asserted more than two years from the end of the Engagement Period. This indemnification shall apply to all current and future assignments in which Tarsus has or will provide services for, on behalf of, or at the direction of Mid-States.

### _Indemnification by Tarsus_

Tarsus agrees to indemnify, defend and hold harmless Mid-States and its principals, members, employees, contractors and representatives (each, an

4

"Indemnitee") from and against any and all damages, loss in value, expenses (including attorneys' fees), costs, judgments, fines, and amounts paid by Indemnitee, whether or not in connection with a third party claim, resulting from the gross negligence or willful misconduct of Tarsus or its employees or agents in connection with the services provided under this Master Engagement Agreement; provided, however, that the financial responsibility of Tarsus under this paragraph shall be capped at the amount of fees paid, in aggregate, to Tarsus under this Master Engagement Agreement.

Any claim by or on behalf of either party arising out of the Master Engagement Agreement shall be deemed waived if a claim is asserted more than two years from the end of the Engagement Period.  This indemnification shall apply to all current and future assignments in which Tarsus has or will provide services for, on behalf of, or at the direction of Mid-States.

### *Modification of Master Engagement Agreement*

No waiver or modification of this Master Engagement Agreement or of any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed.

### *Governing Law*

It is understood and agreed that the construction and interpretation of this Master Engagement Agreement shall at all times and in all respects be governed by the laws of the State of Missouri.

### *Conclusion*

We look forward to providing our services to Mid-States and to assisting the Company during the period of this Master Engagement Agreement.

Confidential                                                  Tarsus CFO Services, LLC
                                                              May 13 201*

Please sign and date where indicated below if this document accurately reflects
our agreement on the services to be provided by Tarsus and the remuneration to
be remitted for such services.

IN WITNESS WHEREOF, Mid-States and Tarsus have duly executed this Master
Engagement Agreement by duly authorized representatives thereof as of the day
and year first above written.

**TARSUS CFO SERVICES, LLC**

Paul L. Burns
Member & Partner

Confirmed and Agreed to:
**MID-STATES SUPPLY COMPANY, INC.**

Benjamin Hurst, CEO

Date

Confidential

Tarsus CFO Services, LLC
May 13, 2011

**Exhibit A**

**Interim CFO Services**

Exhibit A to the Master Engagement Agreement between Mid-States Supply Company, Inc. ("Mid-States") and Tarsus CFO Services, LLC ("Tarsus") dated May 13, 2011.

Per our discussions with Mid-States, the following identifies the scope of services, the engagement period, the fees and the terms and conditions for the Interim CFO Services assignment for Mid-States ("Exhibit A Engagement"):

### *Scope of Services*
Tarsus will be working closely with and at Mid-States' direction to establish and fulfill on a part time basis the position of Chief Financial Officer.

In the capacity of CFO, Tarsus will, among other tasks:

1.    Assist with the preparation of financial statements as of March 31, 2011 and the year then ended and any accompanying supplemental financial information required by existing loan agreements;

2.    Assist and coordinate with KPMG to facilitate performance of their audit examination of Mid-States' March 31, 2011 financial statements, including, among other things, the costing of the March 31, 2011 physical inventory counts; proper cutoff and reconciliation of the physical counts to perpetual inventory amounts and adjustments on the general ledger; review and evaluation of reserves for obsolete inventories and doubtful accounts receivable;

3.    Assist in facilitating the performance of an independent valuation of inventories and accounts receivable by Hilco; and

4.    Develop internal financial reporting procedures for the purpose of enabling the preparation of accurate and timely interim financial reports required by banking agreements.

Tarsus will assist the Company in prioritizing the above efforts. Tarsus understands the Company's immediate needs but will keep an eye towards, and implement as time permits, long-term process and reporting improvements that will provide better, real-time information to the Company's senior management team and that improve the Company's controls and auditability going forward.

The parties understand this scope may change based on Mid-States' needs or findings during the Exhibit A Engagement. Any material change in scope that

Confidential                                              Tarsus CFO Services, LLC
                                                          May 13, 2011

significantly increases the time or resource commitment by Tarsus must be
agreed to in writing and/or will be addressed in a separately executed Exhibit.

### Engagement Period

The Engagement Period covered by this Exhibit A Engagement will commence
on May 13, 2011 and will remain in effect until the earlier of September 30, 2011
or receipt of written cancellation as described in the Master Engagement
Agreement.

### Fees and Terms & Conditions

The fees for the Scope of Services and for the Engagement Period of this Exhibit
A Engagement are as follows:

| Tarsus Personnel | Per Hour Rate |
|---|---|
| Tarsus Lead Professional | $175 |
| *(e.g., Liz Low)* | |
| Tarsus Secondary Professional | $100 |
| *(as discussed, a professional working at Lead's direction to complete necessary work at a lower rate)* | |

All fees will be invoiced weekly in arrears and will be due net, 15 days. If any
amounts owed to Tarsus become past due for 20 days or greater, then Tarsus
will have the right to charge a monthly finance charge equal to 2% multiplied by
the total amounts outstanding at the beginning of the current month.

Confirmed and Agreed to:

MID-STATES SUPPLY COMPANY, INC.

Benjamin Hurst, CEO

5-16-2011

Date

Confidential

Tarsus CFO Services, LLC
September 28, 2011

**Exhibit B**

## CFO & Back Office Build Services

Exhibit B to the Master Engagement Agreement between Mid-States Supply Company, Inc. ("Mid-States" or the "Company") and Tarsus CFO Services, LLC ("Tarsus") dated May 13, 2011.

Per our discussions with Mid-States, the following identifies the scope of services, the engagement period, the fees and the terms and conditions for the CFO & Back Office Build Services assignment for Mid-States ("Exhibit B Engagement"):

### *Scope of Services*
Tarsus will be working closely with and at Mid-States' direction to establish and fulfill on a part time basis the position of Chief Financial Officer.

In the capacity of CFO, Tarsus will, among other tasks:

Lead near- and mid-term accounting and reporting requirements
- Work with team to establish treasury management features/functions
- Weekly Collateral Report – work with Cheryl and automate processes with IT
- Month-end Collateral Reporting – train team, defining repeatable processes
- Reconcile Inventory to General Ledger – develop new process for critical monthly reconciliation
- Drive Monthly Financial Statements towards GAAP basis
- Prepare Compliance Certificates and Financial Covenant Calculations
- Prepare for and drive to conclusion Wells Collateral Audits – expected every 60-90 days
- Prepare for annual KPMG Audit – significant first time event for the Company

Drive development of processes and procedures for ongoing completion of accurate and timely financial reports

- Work with team to define repeatable processes and procedures
- Assign appropriate team members
- Organize responsibilities, work flows and develop Org Chart for current and future back office
- Identify automation opportunities and work with IT to assess and implement
- Train and mentor staff in order to build a strong back office capable of supporting future growth and the needs of senior management

Confidential

Tarsus CFO Services, LLC
September 28, 2011

Tarsus will assist the Company in prioritizing the above efforts. Tarsus understands the Company's near-term needs but will keep an eye towards, and help implement as time permits, long-term process and reporting improvements that will provide better, real-time information to the Company's senior management team and that improve the Company's controls and audtability going forward.

Based upon a well-defined job description, Tarsus will commence an exclusive and confidential search for a highly qualified Controller and, once the new Controller is hired, help on-board and train the Controller for the tasks ahead. Current expectations are for a January 2012 start date under the following conditions: *To be discussed – likely in this range*

- Expected base of $120K plus tie into bonus structure: *100K max* → *All To Be discussed*
- Strong accounting and IT skills. *PERFORMANCE DRIVEN INCENTIVE*
- Audit experience, likely a CPA;
- Experience implementing/improving processes and growing companies; and
- Ten-plus years of experience with a degree in Accounting and a cultural fit

The parties understand this scope may change based on Mid-States' needs or findings during the Exhibit B Engagement. Any material change in scope that significantly increases or decreases the time or resource commitment by Tarsus must be agreed to in writing and/or will be addressed in a separately executed Exhibit.

### _Engagement Period_
The Engagement Period covered by this Exhibit B Engagement will commence on October 1, 2011, and will remain in effect until the earlier of September 30, 2012, or receipt of written cancellation as described in the Master Engagement Agreement

### _Fees and Terms & Conditions_
The fees for the Scope of Services and for the Engagement Period of this Exhibit B Engagement are as follows:

| Tarsus Personnel | Daily Rate | Hourly Rate |
|---|---|---|
| Tarsus Lead Professional (e.g. Mike Lutz) | $1,440 | $160 |

| Placement Services | % of First Year Salary |
|---|---|
| Fees for new hires, contingent upon acceptance | 25% |

Current expectations are for a status quo time commitment of 3 to 4 days per week during the first 60 to 90 days of this Exhibit B Engagement. Thereafter, the parties expect to transition to 2 to 3 days per week for the remainder of the Exhibit B Engagement. Tarsus will work with Mid-States to flex up and down (within these time commitment parameters) based on the needs of the Company

Confidential                                                          Tarsus CFO Services, LLC
                                                                          September 28, 2011

All fees will be invoiced weekly in arrears (typically in half day increments) and will be
due net, 15 days. If any amounts owed to Tarsus become past due for 20 days or
greater, then Tarsus will have the right to charge a monthly finance charge equal to 2%
multiplied by the total amounts outstanding at the beginning of the current month.


Confirmed and Agreed to:

MID-STATES SUPPLY COMPANY, INC.


Benjamin Hurst, CEO


Date

Confidential

Tarsus CFO Services, LLC
June 5, 2015

**Exhibit E**

## Interim Controller-Level Services

Exhibit E to the Master Engagement Agreement between Mid-States Supply Company, Inc. ("Mid-States" or the "Company") and Tarsus CFO Services, LLC ("Tarsus") dated May 13, 2011.

Per our discussions with Mid-States, the following identifies the scope of services, the engagement period, the fees and the terms and conditions for the Interim Controller-Level Services assignment for Mid-States ("Exhibit E Engagement").

### Scope of Services

Tarsus will work closely with and at the Company's direction to provide Interim Controller-Level services.

Items of expected focus during this project shall include duties typically performed by a Controller. It is anticipated that the work will require 40 to 50 hours per week to complete for the entire term of the engagement.

The parties understand this scope may change based on the Company's needs or findings during this Exhibit E Engagement. Any material change in scope that significantly increases or decreases the time or resource commitment by Tarsus must be agreed to in writing and/or will be addressed in a separately executed Exhibit.

### Engagement Period

The Engagement Period covered by this Exhibit E Engagement will commence on June 5, 2015 and will remain in effect until such a time that Mid-States determines that it is ready to hire a permanent Controller. It is anticipated that the engagement will run between four and eight months. This Exhibit E Engagement may be cancelled by either party with a fourteen (14) day written notice.

*or no longer needs Interim position.*

### Fees and Terms & Conditions

The fees for the Scope of Services and for the Engagement Period of this Exhibit E Engagement are as follows.

| Tarsus Personnel | Hourly Rates |
|---|---|
| Controller-Level Professional | $85 |

Confidential

Tarsus CFO Services, LLC
June 5, 2015

All fees will be invoiced weekly in arrears and will be due net, 10 days. If any amounts owed to Tarsus become past due for 20 days or greater, then Tarsus will have the right to charge a monthly finance charge equal to 2% multiplied by the total amounts outstanding at the beginning of the current month.

IN WITNESS WHEREOF, Mid-States and Tarsus have duly executed this Exhibit E Engagement by duly authorized representatives thereof.

**TARSUS CFO SERVICES, LLC**

Paul L. Burns
Member & Partner

Confirmed and Agreed to:

**MID-STATES SUPPLY COMPANY, INC.**

Benjamin Hurst, CEO

6-5-15

Date

Confidential

Tarsus CFO Services, LLC
August 4, 2015

## Exhibit G

## Interim Controller Professional

Exhibit G to the Master Engagement Agreement between Mid-States Supply Company, Inc. ("Mid-States" or the "Company") and Tarsus CFO Services, LLC ("Tarsus") dated May 13, 2011.

Per our discussions with Mid-States, the following identifies the scope of services, the engagement period, the fees and the terms and conditions for the Interim Controller Professional assignment for Mid-States ("Exhibit G Engagement").

### *Scope of Services*
Tarsus will work closely with and at the Company's direction to provide an Interim Controller Professional.

Items of expected focus during this project shall include duties typically performed by a Controller, including certain key vendor cash flow management projects. It is anticipated that the work will require 40 to 50 hours per week to complete for the entire term of the engagement.

The parties understand this scope may change based on the Company's needs or findings during this Exhibit G Engagement. Any material change in scope that significantly increases or decreases the time or resource commitment by Tarsus must be agreed to in writing and/or will be addressed in a separately executed Exhibit.

### *Engagement Period*
The Engagement Period covered by this Exhibit G Engagement will commence on August 4, 2015 and will remain in effect until such a time that Mid-States determines that it is ready to hire a permanent Controller. It is anticipated that the engagement will run between four and eight months.

If the Company recruits the Interim Controller Professional and such professional accepts to work for or provide services to the Company outside of this Exhibit G Engagement, Mid-States agrees to pay Tarsus a one-time conversion fee, at the time of start date. Mid-States and Tarsus will work in good faith and come to mutual agreement on a fair and market-based one-time conversion fee at that appropriate point in time. This Exhibit G Engagement may be cancelled by either party with a fourteen (14) day written notice.

Confidential

Tarsus CFO Services, LLC
August 4, 2015

## *Fees and Terms & Conditions*

The fees for the Scope of Services and for the Engagement Period of this Exhibit
G Engagement are as follows.

| Tarsus Personnel | Hourly Rates |
|---|---|
| Interim Controller Professional | $120 |

All fees will be invoiced weekly in arrears and will be due net 10 days. If any
amounts owed to Tarsus become past due for 20 days or greater, then Tarsus
will have the right to charge a monthly finance charge equal to 2% multiplied by
the total amounts outstanding at the beginning of the current month.

IN WITNESS WHEREOF, Mid-States and Tarsus have duly executed this Exhibit
G Engagement by duly authorized representatives thereof.

**TARSUS CFO SERVICES, LLC**

Paul L. Burns
Member & Partner

Confirmed and Agreed to:

**MID-STATES SUPPLY COMPANY, INC.**

Benjamin Hurst, CEO

8 - 5 - 15
Date